SENA G. DOLPH, Appellee, v. AMANDA WORTMAN et al., Appellants; MARTICIA V. DOLPH, Intervener.

**GIFTS: Failure to Consummate—Mistake—Effect.** A failure to *fully* consummate an intended gift *inter vivos*, during the lifetime of the donor, even though such failure is the result of a manifest mistake on the part of the donor, absolutely nullifies the intended gift.

PRINCIPLE APPLIED: A grantor, purely out of love and affection, intended to make a gift to his brother of Sec. 8, Twp. 71, Range 40, Mills County, Iowa. The deed described the land correctly, except that it gave the range as "42." The grantor never owned any land in Range 42. *Arguendo*, it was conceded that said deed was duly delivered. The grantee was never in possession of the land. After the death of both brothers, the mistake was discovered. *Held*, the gift must fail.

**REFORMATION OF INSTRUMENTS: Voluntary Deed.** A voluntary deed,—one supported by no consideration other than the affection which the grantor held for his brother, grantee,—may not be reformed or enforced.

PRINCIPLE APPLIED: See No. 1.

**ESTOPPEL:**  Equitable Estoppel—Non-Change of Pleading, Etc.  One is not estopped to assert the existence of a fact, when his antagonist (a) has not pleaded an estoppel, (b) has in no wise changed his position, and when the pleadings of the one sought to be estopped have always been consistent with the existence of the fact in question.

**DEEDS:**  Delivery—Conditional Delivery.  No legal and effective delivery of a deed exists until the grantor makes such a delivery that it may be said therefrom that he fully and unreservedly intended to irrevocably dispossess himself of all title. So held as to a transaction where grantor, on two occasions, manually handed a deed of gift to the grantee, his brother, with directions to record the deed *if* he (grantor) did not survive, in one case, a trip to a distant place, and in another case, a severe sickness, the grantor in each case having subsequently, and without controversy with the grantee, repossessed himself of the deed, and having died in possession of the land and of the deed.

*Appeal from Mills District Court.*—O. D. WHEELER, Judge.

JUNE 27, 1918.

REHEARING DENIED MARCH 12, 1919.

SUIT in partition of lands in the name of A. H. Dolph at the time of his death.  By way of cross-petition and petition of intervention, the widow and children of J. H. Dolph alleged that 954 acres of the land had been conveyed to J. H. Dolph, and prayed that title thereto be quieted in them.  The plaintiff, as widow of A. H. Dolph, alleged that, if J. H. Dolph acquired said land, this was in fraud of her marital rights.  These allegations were put in issue; and, on hearing, the court found that the 954 acres of land were conveyed to J. H. Dolph before the intermarriage of A. H. Dolph and plaintiff, and that this was in fraud of plaintiff's marital rights; and decreed that the plaintiff was entitled to an undivided one half of said land, and the widow and children of J. H. Dolph to the other half.  All parties other than plaintiff appeal.—*Reversed.*

*Genung & Genung, Tinley, Mitchell, Pryor & Ross,* and *John Y. Stone,* for appellants.

*C. E. Dean, Genung & Genung,* and *Tinley, Mitchell, Pryor & Ross,* for appellee.

LADD, J.—I.   A. H. Dolph, known herein as Henry, died January 18, 1916, intestate, seized of about 2,000 acres of land, leaving a widow, plaintiff herein, and no descendants.   His first wife, to whom he was mar-

1. GIFTS: failure to consummate: mistake: effect.

ried in 1857, died in June, 1894, and he was married to plaintiff, a widow, with three children, June 17, 1896.   Her right to one half of all the above land except 954 acres is not questioned, nor is the right of defendants and cross-petitioners to share therein, or their respective portions.   But it is alleged by cross-petitioners that, on August 28, 1895, Henry made and delivered to his brother, J. H. Dolph, known herein as Hiram, a warranty deed of:

"All of Section 8 and the Northeast Quarter and the North Half of Southeast Quarter of Section 7, and the East Half of the Northwest Quarter of said Section 7 except a small lot of about 6 acres in the northwest corner of said East Half of the Northwest Quarter of Section 7, all in Township 71, Range 40, in Mills County, Iowa, being all the land described in the petition as being in said Sections 7 and 8 except the Southwest Quarter of said Section 7."

Hiram departed this life, July 8, 1914, leaving a widow, Marticia V. Dolph, sister of Henry's first wife.   She, by petition of intervention, joined the cross-petitioners, who are her children by Hiram, in praying that the petition be dismissed as to above-described land, and the title to an undivided one third of said land be quieted in intervener, and to an undivided two thirds thereof in cross-petitioners. For convenience, these parties may be referred to as cross-petitioners.

A sister of Henry's, and nephews and nieces and children of deceased nephews and nieces, are defendants; and they, with plaintiff, put in issue the allegations of the cross-petition; and, in addition thereto, plaintiff alleged that the deed from Henry to Hiram, if executed, was in fraud of her marital rights, subsequently acquired, and ought not to bar her claim to share, to the extent of an undivided half of the land alleged to have been conveyed, as widow of Henry. The alleged deed was not produced at the trial, but was found by the court to have been executed, and to have been in fraud of plaintiff's marital rights; and on July 3, 1914, she was decreed to be entitled to an undivided one half thereof, and cross-petitioners, being the wife and children of J. H. Dolph, to the remaining one half. The defendants and the cross-petitioners appealed.

After defendants had filed their abstract, on December 22, 1917, the several parties stipulated that the deed bearing date August 28, 1895, attached to the stipulation, was the original deed referred to in the evidence on the trial; that plaintiff, in the fore part of August, 1916, gave some of the old wearing apparel which had been worn by Henry to her sister, Mrs. Byers, for the use of her husband; that Mrs. Byers took such apparel to her home in Kansas, and, at some time in the fall, found the deed in an envelope in one of the vest pockets of said apparel, and thereupon notified plaintiff's son, and later delivered the deed to him, and he to plaintiff; and that the deed, with the envelope, might be mailed to the Supreme Court of Iowa, and should be treated by the court as in evidence, and the deed as the original deed, and might be used and inspected by the Supreme Court in the determination of the appeal, with the understanding that this stipulation as to the discovery of this deed would be made a part of the record.

II. The deed described "all of Section eight (8) in Township No. seventy-one (71), Range No. forty-two (42),

west 5th P. M." Henry Dolph owned no land in that range, but he did own Section 8 in the township of the same number in Range 40, or 12 miles east of that described. The deed is alleged by cross-petitioners to have been voluntary, and a gift, and the evidence leaves no doubt that the only consideration was love and affection.

The deed, then, even though delivered, did not convey the section of land which Henry Dolph owned in Range 40, and the gift of that section was not completed in his lifetime.

"To constitute a valid gift *inter vivos*, the intention to make it must be satisfactorily established, and this intention must have been executed by actual, constructive, or symbolical delivery of the thing proposed to be given, without power of revocation. In other words, there is no gift until the intention of giving is fully consummated by the donor, transferring all right to and dominion over the thing given to the donee." *Tucker v. Tucker*, 138 Iowa 344.

See *In re Estate of Elliott*, 159 Iowa 107.

"Where something remains to be done in carrying out the donor's intent, no matter how unequivocal the intent itself may be, the gift is not complete; for, so long as the contemplated action is not taken, it is to be presumed that the donor intends to retain the title." *Abegg v. Hirst*, 144 Iowa 196.

Though what was said in these cases related to personal property, the principle that the gift must have been completed is quite as applicable in the case of realty. If the

2. REFORMATION OF INSTRUMENTS: voluntary deed.

delivery of the deed were conceded, it did not convey Section 8; for, even though the grantor intended so to do, he did not carry out that intention.

Cross-petitioners argue that plaintiff and defendants are estopped from arguing that the description in the deed is not in accord with the oral evidence. A sufficient re-

sponse is that a plea of estoppel is not to be

**3. ESTOPPEL: equitable estoppel: non-change of pleading, etc.** found in the issues raised by the pleadings. Moreover, no prejudice upon which to rest such a plea appears to have been suffered. One cannot well be said to have been prejudiced in the discovery of the truth with respect to àn alleged gift, by ascertaining that the donee did not obtain as much as was first thought!

Again, it is argued that whether the deed, if delivered, conveyed less than the 954 acres claimed by the cross-petitioners, was not put in issue. The replies of defendants and plaintiff deny the allegations of the cross-petition, and also specifically deny that any such deed as alleged was ever made or delivered. Plainly enough, then, the issue as to the execution of a deed such as pleaded was definitely raised. The introduction of the deed itself in evidence definitely settled this issue, and proved beyond question that a deed was made, but with description different from that testified to by the several witnesses speaking on that subject.

"It is well settled that courts of equity will not assist the grantee in an imperfect conveyance which is not supported by either a valuable or meritorious consideration against either the grantor or his representatives." *Else v. Kennedy,* 67 Iowa 376.

The principle is concisely stated in *Enos v. Stewart,* 138 Cal. 112 (70 Pac. 1005):

"A court of equity interferes to correct a mistake in a written instrument only in furtherance of justice, and to prevent fraud or some injustice. In this case, by refusing to correct the deed, no fraud or injustice is done to appellant. She has lost nothing, because she paid no consideration for the deed. She has been deprived of nothing the law would otherwise give her. It is true, the intention of the grantor is not carried out; but it would have been equally true if an attempt had been made to make a will, and it had

been defective in a vital part. The court could not reform a will, nor make it so that it would comply with the law. In this case, the deceased intended to convey the property, but she did not do so. That intention will not now be carried out in favor of one who paid nothing for the conveyance, and against a lawful heir."

See *Lister v. Hodgson*, L. R. 4 Eq. Cases 30; *Shears v. Westover*, 110 Mich. 505 (68 N. W. 266); *Willey v. Hodge*, 104 Wis. 81 (80 N. W. 75); *Henry v. Henry*, 215 Ill. 205 (74 N. E. 126); *Mulock v. Mulock*, 31 N. J. Eq. 594; Thornton on Gifts, Section 363. This does not infringe on the rule permitting identification of what is really devised, in case of a will.

Counsel argues that there was a sufficient consideration in the affection of these brothers. For 30 years, they had lived about 80 rods apart. A pathway connected their homes. Henry accorded Hiram honor because of his patriotic service in the War of the Rebellion, during which Henry was accumulating property at home, and desired to recognize his supreme devotion to their common country by a substantial token of his affection and appreciation. But he was under no legal obligation so to do. The only consideration was that of love for his brother and appreciation of his worthiness as a citizen of the republic. The obligation was moral only, and this is held not to constitute a valuable consideration for a conveyance or contract. *Meginnes v. McChesney*, 179 Iowa 563.

There are cases holding that a writing purporting to be for a gift will be enforced by the courts as between blood relatives, but the proximity even must then be close, and has not been extended to collateral heirs. *Marling v. Marling*, 9 W. Va. 79 (27 Am. Rep. 535); *Mahan v. Mahan*, 7 B. Mon. (Ky.) 579; *Burford v. McKee*, 1 Dana (Ky.) 107; Thornton on Gifts, Section 364.

Here, the grantor was a brother, and therefore not gov-

erned by the above cases, even if the suit were for the en-
forcement of a contract. But see *Meginnes v. McChesney,*
supra. There is no escape from the conclusion that the
deed as to Section 8 may not be given effect.

III. The discovery of the deed eliminates all inquiry as
to its existence and contents. Was it ever delivered?
Whether or not an instrument has been delivered is largely
a question of intention, to be gathered from
the facts and circumstances surrounding the
transaction, in connection with the direct
proof. *Brown v. North,* 141 Iowa 215;
*Creveling v. Banta,* 138 Iowa 47; *Foreman v. Archer,* 130
Iowa 49; *Albrecht v. Albrecht,* 121 Iowa 521. The deed
purports to have been signed and acknowledged August 28,
1895, and the stipulation of facts leaves no doubt that it
was in the possession of Henry at the time of his death, and
that Henry continued in the possession of the land, other
than Section 8, described therein, until that event. In the
fall of 1895, Henry was getting ready for a trip to the Pa-
cific coast with Hiram, and, according to the latter's widow,
came to their house in the latter part of August, saying that
he had fixed up his business as he wanted it, and that he
had brought the deed.

> 4. DEEDS: deliv-
> ery: conditional
> delivery.

"Q. What did he say it was? A. He said it was all
of his home place, Section 8 and part of Section 7. He
said W. M. Evans, a banker, had made the deed. Q. What,
if anything, did Henry say to Hiram about who he wanted
to have the 960 acres of land? A. Yes, sir, he said he wanted
him to have it. Q. What did he say about the deed being
good? A. He said it was a warranty deed to this land. He
said, 'Here is a deed to this land that I want you to have.'
He said it was to be recorded at his death. Q. Who did he
say was to have the use of the land as long as he lived? A.
Henry, himself, was to have the use of the land. Q. What,
if anything, did he say about having lots of money and prop-

erty outside of the land? A. He said,—yes, sir,—he had land and lots of money outside of this. He says, 'I don't know as I will ever marry again and I have no children.' * * * Q. What, if anything, did he say in that conversation with Hiram about the effect of the deed? A. He said the deed was good. He said nothing could come against a deed. Q. What did Henry do with said deed that he took in his hand when he was there at that time? A. He gave it to his brother, Hiram, my husband. Q. What did Hiram do? A. He read it over. Q. What did he first do when he read it over,—tell the court whether he took it in his hands. A. I said he took it in his hands. Q. What did Hiram say to him about reading it over, if anything? A. He told him to take the deed,—read it over. Q. Did Hiram say anything to Henry to the effect that he would accept the deed? A. Yes, sir. Q. What, if anything, did he say? A. 'Why, Henry, of course, if you wish it,'—or something to that effect. Q. That is, Hiram said something of that kind. A. Yes, sir. [The witness added that she had no part in the conversation.] I remember when Henry started back that day. Q. What, if anything, did he say to Hiram about what they would do with that deed? A. Hiram took the deed he wanted up town, and put it in the bank. Q. What bank? A. Evans' bank. Q. What did you hear Henry say to Hiram about what they had better do with the deed, if anything; what did Henry say to Hiram,—not what they did,—but what did Henry say to Hiram about it? A. They would put it in his papers. Yes, sir, they would go up and put it in the bank in his papers. * * * Q. Well, now, who had the deed in his possession when Henry said that to Hiram? A. Hiram had the deed. Hiram put the deed in his pocket when they went to town."

The witness testified that her second daughter, Mrs. Davis, was present; and the latter's account of the transaction was substantially the same as that of her mother.

Harvey (Hiram's son) recalled having heard a conversation between Henry and Hiram, shortly before their trip to the West, wherein the former said:

"Hiram, I have been telling Harvey about my going away for awhile out West, and I have told him about the making of this deed to you for the 960 acres of land. I have told him, in case anything would happen to me, or both of us, that he was to get this deed and have it recorded; that he was to leave it in the Evans bank, at Malvern."

Evans testified to having been cashier of the First National Bank at Malvern at that time; that Henry employed him to prepare a deed of the land from Henry to Hiram, and a like deed from Hiram to Henry; and that they were signed and acknowledged at the bank at the same time; that the deed from Henry to Hiram was left at the bank until it closed, some time in 1896. The circumstance warranted the conclusion that the witness was confused, and the reference to the deed executed by Hiram, and that feature of the case, requires no further attention.

Strohl recited a conversation which he claimed to have had early in April, 1895:

"He told me about making a deed to that land there, that he had to Hiram Dolph; that he had made a deed prior to his marrying with Mrs. Dolph, and told me what land he had deeded to his brother. Q. What did he say it was?. A. He told me that it was Section 8 and three 80's in 7. * * * The way he came to tell me was in regard, as I started to tell before, about the brick he had hauled up to another place, where the new home is now. There was a rumor in the neighborhood that he was going to build a new house. I made the remark about him building a new house."

The witness, after relating some conversation, proceeded:

"Then is when he told me that this land belonged to

Hiram. Henry Dolph said the arrangement was that Hiram was to have the land after his death. Q. He did say he was to have the use of the land? A. He said he was to have the use of the land as long as he lived, himself. He said the deed was not to be recorded until after his death. * * * He didn't want to build it [new house] there, because that land belonged to his brother Hiram, he said. * * * He said the reason he gave it to Hiram was because Hiram served in the army,—that is, in the Rebellion,—and fought for his country, and he felt as though he was under obligation to give Hiram some- thing, because he stayed at home and made lots of money, while Hiram was in the war."

It will be observed that the witness claimed to have had this conversation some months before the deed was drawn. One White testified that the witness had said to him, short- ly before testifying, that he knew nothing of the transac- tion; though the witness denied this. This witness also ap- pears to have been somewhat confused, and he says that Henry told him that Hiram was to have the land after his death, and that it belonged to Hiram. It also appears that, in the spring of 1896, Henry gave a dinner at his home, at which several guests were present, and among them, Mrs. Gridley, plaintiff in this case. The widow of Hiram, her two daughters, and her son Harvey substantially agreed in their testimony that the conversation arose concerning the place, in which Mrs. Gridley remarked that it was pretty, and the home nice; that Henry agreed with this, but, point- ing to the land surrounding, remarked, in substance, that he only had the use of it during life; that it belonged to Hiram. On the other hand, Mrs. Keckley was present, and recalled having heard no such conversation as mentioned; but swore that someone asked Henry about his father's homestead, and he replied, "No, Hiram has father's home- stead," and that it belonged to Hiram.

Mrs. Kearny, a sister of plaintiff's, who was present, denied having heard the talk testified to by the witnesses other than Mrs. Keckley, and the plaintiff was sure that no such conversation occurred.

The story is unreasonable. According to Mrs. Gridley, she was then engaged to marry Henry. He had invited her to his home that she might meet his relatives. This was the home to which he was about to take her. Their courtship was not over. If, at that time, he made the statement claimed, probably it is the first time in the world's history that a man courting a woman under similar circumstances has been equally frank. What probably did occur was the conversation related by Mrs. Keckley, an entirely disinterested witness; and reference to "old homestead" or "old place" of Hiram's father could easily have been confused with, or, at least, recalled, after the lapse of 20 years, as the "old place" of Henry.

According to Mrs. Keckley, who is a daughter of Dr. Brothers', the family physician of Henry, the latter left the deed with the doctor in 1901, and the witness cared for it until the doctor's death, in 1906, when she placed it in the vault of the First National Bank of Malvern, and informed Henry of this the following year, when he said he would call for it. Hiram's son Howard claimed to have heard Henry remark, in 1909, that the deed was at this bank.

Hiram's widow recalled the circumstance of Henry's coming to the house in February, 1911, and telling her husband that he was going west, and would leave the deed at the bank; that he said he was not well, and said the envelope containing the deed was marked "J. Hiram;" and that, if he should die, Hiram was to take the deed and have it recorded; that it was at the Malvern bank. In July or August, Henry was sick, and called Hiram over to his house. Hiram's wife accompanied him, and, upon their arrival, according to her story, Henry said:

"Possibly I won't get well. Take your deed. I am very ill,—I don't know as I will get well. Q. Where did Henry get it from? A. He took it from his trousers pocket. His trousers were lying at the head of his bed or desk or stand. Henry was in bed. * * * Q. Did he take anything out of his trousers pocket? A. Yes, sir, he took his deed. Q. He took what? A. His deed. Q. What did he do with it, other than to hand it to Hiram, his brother? A. He handed it to Hiram, his brother. Q. What did he say about it? A. If I do not get well, you put it on record. He said he had the deed in his possession just a short time. Q. Did he say where he got it, a few days before that time? A. He says, 'Here is your deed,—take it and keep it. If I don't get well, you, of course, put it on record.' "

He had gotten the deed out of the Malvern bank a few days before. On the back of the envelope was "J. Hiram Dolph." The envelope was not sealed. Several witnesses testified to having seen and read the deed at Hiram's house. Henry called for it in the latter part of October, said he was feeling better, and, according to the witness, told Hiram to "get your coat and your deed," and they would take it to a bank at Hastings,—and started on their way, so to deposit it.

The evidence also tends to show that, shortly before Hiram's death, Henry assured him that the deed would be recorded at his (Henry's) death; that it was with Henry's papers at the bank; and that, shortly after Hiram's death, Henry, in response to the inquiry of his widow, "What about this deed of Hiram's?" said:

"It is just like it has always been; it was with my papers; it is all right. Nothing can change it. It was to be recorded at my death, as we always understood, and as Hiram knew. * * * It is with my papers, and I want it recorded at my death."

Not all the evidence bearing on this issue has been

recited, but enough to present every phase of the case; and we are unable to escape the conviction that there was never an intention on the part of Henry to make an unconditional delivery of the deed. If he handed it to Hiram in 1895, as he doubtless did, it was to allow him to read it and arrange for its custody at the bank with Henry's papers, and with the understanding that, if anything happened to Henry on his trip west, so that he did not return, the land described should be Hiram's. But Henry returned, and the deed continued in his custody for more than 15 years, when it was again handed to Hiram, with instructions to record if he (Henry) did not get well. The design seems to have been that title to the 954 acres pass, if Henry should not return or should not recover. Even the direction to Harvey Dolph was that, if anything should happen to Henry, or both Henry and Hiram, he (Harvey) should get the deed and have it recorded. The record contains some statements from which, if standing alone, delivery might be inferred. But the witnesses testify from memory, of conversations occurring many years previous. They are interested, and parties to the suit, and competent to testify only because of not having participated in the conversation related. These circumstances are to be considered, as bearing on their credibility. *Hart v. Hart*, 181 Iowa 527. Moreover, others were not present during a large part of these conversations; and the adverse parties necessarily rely upon the circumstances shown, the probability or improbability of the stories told, and a comparison of these with ordinary rules of human conduct, under similar circumstances, to test the credibility of the several witnesses. Notwithstanding all this, we have been impressed with the candor and good faith of those who have testified concerning these conversations. The conversations between these brothers doubtless were substantially as related. In the nature of things, the exact words, doubtless, were not recalled; but the story, in a general way,

was as related. The evidence of these conversations is not alone to be considered. The conduct of these men is quite as, if not more, important in determining what Henry intended, in what was done with the deed. Doubtless, the deed passed between Henry and Hiram about as the witnesses described; but whether the mere handing of the deed by one to another passes title *in praesenti*, depends upon the intention with which this is done. Did Henry, in the conversation had in August, 1895, intend to part with title? If so, how came he to retain the deed in his control? His health was not good, and he was about to take a trip west. Without children or wife, he quite naturally wished Hiram, for whom he had even more than a brother's affection, to have the larger portion of his estate. The talk with his brother so indicated. If he handed the deed to Hiram, it was to enable him to read it; and, even though some of the evidence might be cosntrued as indicating a purpose to then part with title,—and this is doubtful,—such an inference is obviated by the circumstance that, immediately following the talk, they agreed that the deed should be deposited with Henry's papers at the bank, and they started away so to do. Why deposit it with Henry's papers, if it had been delivered to Hiram? The only explanation possible is that these men, unfamiliar with the law, might have thought that retaining the deed would assure to Henry the use of the land described therein for life. But nothing appears to have been said, justifying this conclusion. On the contrary, what was said and done is more suggestive of the purpose to make a gift of this land *causa mortis;* that is, that Hiram should have the land in event Henry died, and not otherwise. Such a gift of realty may not be made. *Reeves v. Howard,* 118 Iowa 121. See *Vosburg v. Mallory,* 155 Iowa 165.

The talk concerning Henry's having the use during life, and not recording the deed until his death, is confirmatory

of this conclusion, though not necessarily inconsistent with the theory that the deed was delivered. Harvey Dolph's account of a conversation between the brothers, wherein Henry told Hiram that he had directed Harvey to get the deed and have it recorded, if anything happened to Henry, or to both, is susceptible of no other explanation, unless it be that the deed previously had been delivered. And the same is true of the talk had in 1911. As said, all these conversations are to be considered and construed in connection with what was done, in ascertaining the intention of Henry with reference to this deed. That he was in possession of the deed at the time of his death is a strong circumstance against the theory of there having been a previous delivery; and this is strengthened by the fact that, except momentarily, in 1895, and for a few months conditionally, in 1911, the deed continued in Henry's possession or control during more than 21 years, from its making until Henry's death, and that, during all this time, Henry continued in possession, and, in so far as known to his neighbors, other than Hiram and family, as absolute owner.

Even though there be some evidence—and we do not pretend to have quoted all of it—which, standing alone, might be construed as showing a delivery of the deed, the facts with respect to its custody and the circumstances proven are so inconsistent with any design on his part of presently passing title, that the inference is irresistible that, whatever may have been said or done, there was no intention on Henry's part of passing title *in praesenti*. The inference is equally strong that he did intend the deed to become efficient in conveying title to Hiram upon his death; but the gift, to be effective, must have been completed by delivery in his lifetime. This conclusion obviates the necessity of passing on the appeal of cross-petitioners; and intervener, as plaintiff, in any event, will be entitled

to her distributive share.   The decree on the appeal of defendants is—*Reversed.*

PRESTON, C. J., EVANS and SALINGER, JJ., concur.