SENA G. DOLPH, Appellee, v. AMANDA WORTMAN et al.,
Appellants.

**NEW TRIAL: Conditions Precedent.** An applicant for a new trial un-
der Sec. 4091 *et seq.*, Code, 1897, must assume the burden to estab-
lish two facts:

    1. His *grounds* for a new trial.

    2. The existence of a cause of action or defense, as the case
may be.

**TRIAL: Law(?) or Equity(?)—Equitable Proceeding for New Trial.**
A proceeding for a new trial on the ground of fraud, in an action
of partition involving an issue of title, is properly tried in equity,
especially when such trial was acquiesced in by the parties in the
trial court.

**NEW TRIAL: Grounds—Fraudulent Concealment of Deed.** The con-
cealment by a litigant, during an equitable trial, of a deed which
was material to a pending issue of title, when such deed was
produced in such time that, by stipulation, both parties had the
full benefit of said deed on trial *de novo* on appeal, is not such
fraud as will authorize the granting of a new trial, under Sec. 4091,
Code, 1897.

**DEEDS: Execution Without Delivery.** The retention by grantor, up
to the time of his death, of a full warranty deed, executed with the
undoubted intent on his part to *ultimately* deliver the deed to grantee,
and with the equally undoubted intent of grantor to have control
of and enjoy the property during his lifetime, and to cast the en-
tire ownership of the property upon grantee upon the death of
grantor, necessarily deprives the instrument of all legal effect.

**DEEDS: Conditional Delivery.** Principle reaffirmed that no legal de-
livery of a deed is effected by passing the deed to the grantee
*on a condition which never happens.*

*Appeal from Mills District Court.*—J. B. ROCKAFELLOW, Judge.

JUNE 25, 1921.

REHEARING DENIED OCTOBER 1, 1921.

APPLICATION by intervener and cross-petitioner defendants
to vacate a judgment and for a new trial. After full hearing,
the application was denied, and the intervener and cross-peti-
tioner defendants have appealed.—*Affirmed.*

*W. S. Lewis, F. S. Howell,* and *Clark, Byers & Hutchinson,* for appellants.

*C. E. Dean, Genung & Genung,* and *Tinley, Mitchell, Pryor, Ross & Mitchell,* for appellees.

EVANS, C. J.—The original case was heard by us on appeal. *Dolph v. Wortman,* 185 Iowa 630. After a remand of the case, and an entry of judgment in accord with our reversing opinion, the application to vacate judgment and for a new trial was made. The salient facts involved in the litigation are quite fully set forth in our former opinion, herein cited. We shall not repeat these facts here, except in a very general way. Upon the record as now presented to us upon this application, we should not be justified in finding the facts other than as set forth in such former opinion. The plaintiff, Sena Dolph, is the widow of Henry Dolph, deceased, who died intestate, and without direct heirs, in January, 1916. He left surviving him, as collateral heirs, one sister and the descendants of two deceased brothers and one deceased sister. One of the deceased brothers was Hiram Dolph, who, for a lifetime, had been Henry's nearest neighbor and closest friend. This suit was brought by the widow in partition of the real estate left by Henry Dolph, consisting of about 2,000 acres. The parties defendant are all collateral heirs. These collateral heirs fall into two classes, for the purpose of this litigation. One class consists of the children of the deceased brother Hiram, who set up a claim adverse both to the plaintiff and to the other collateral heirs, codefendants. In this adverse claim, their mother, Marticia Dolph, joins as intervener. These heirs filed a cross-petition against their codefendants and against the plaintiff, claiming to be the absolute owners of 954 acres of the land in question. They are known in the record as the cross-petitioner defendants. The other defendants make no issue with the plaintiff, and are represented by the same counsel. The claim of the cross-petitioners is based upon a warranty deed executed by Henry Dolph on August 28, 1895, purporting to convey to Hiram Dolph a certain Section 8, and approximately one half of a certain Section 7. The prime question in the case, both on the former trial and now, was and is whether such deed was ever delivered. Our finding upon the original trial and appeal

was adverse to a finding of delivery. The present application for a new trial is made under the provisions of Code Sections 4091 to 4099, inclusive. The ground alleged under Section 4091 is that of fraud practiced in obtaining the judgment. The specifications of fraud alleged are, in brief, that the plaintiff had fraudulently obtained possession of the deed referred to herein, shortly after the death of her husband, and that she had voluntarily concealed from these defendants that fact, and that, as a witness upon the trial, she had fraudulently denied the existence of such a deed or any knowledge thereof on her part, whereby the cross-petitioners were prevented from using said deed as an instrument of evidence in the original trial. It is further specified that, after the trial in the district court, and while the case was pending upon appeal here, the plaintiff fraudulently pretended that said deed was discovered by third parties in the pocket of a vest formerly owned and worn by the deceased; and that she caused the same to be exhibited to cross-petitioners' counsel; and that she made certain false representations concerning the contents of the deed; whereby counsel were fraudulently induced to sign a stipulation and to file the same in this court while the appeal was pending; that she had caused a fraudulent alteration in such deed, whereby it failed to describe the land involved in the controversy; and that this fact was concealed from the counsel of cross-petitioners at the time that the stipulation was signed.

The foregoing is, perhaps, sufficient to indicate the general nature of the charge of fraud. On the hearing of the application, evidence was adduced by the cross-petitioners in support of such charge. New evidence, alleged to be newly discovered, was also introduced in support of the claim of delivery of the deed. The record of the former trial is all incorporated in the present record. The ultimate question, therefore, presented to us upon the combined records is: Should the application to vacate and for a new trial be granted?

Under the statute, this question is a compound one, and is divisible into two parts:

1. NEW TRIAL: conditions precedent.

(1) Have the appellants proved the alleged fraud?

(2) Does the newly discovered evidence, in

combination with the evidence on the original trial, disclose a good cause of action for the cross-petitioners? Code Sections 4096, 4097. These sections provide as follows:

"Sec. 4096. The judgment shall not be vacated on motion or petition until it is adjudged there is a cause of action or defense to the action in which the judgment is rendered; if a judgment is modified, all liens and securities obtained under it shall be preserved to the modified judgment.

"Sec. 4097. The court may first try and decide upon the grounds to vacate or modify a judgment or order, before trying or deciding upon the validity of the cause of action or defense."

I. The briefs disclose a preliminary controversy between the parties as to the nature of the proceedings under which the hearing of this application was had. The appellees herein con-

2. TRIAL: law (?)
or equity (?):
equitable pro-
ceeding for new
trial.

tend that it was triable as an ordinary proceeding, and is, therefore, not triable *de novo* here; whereas the appellants contend that it *is* triable *de novo* here. The appellees rely upon the statute which provides that it shall be triable as an ordinary proceeding; whereas the appellants contend that the trial court, upon the trial, expressed the view that the application ought to be heard on the equity side, and that this suggestion was acquiesced in by all the parties, and that the case was so tried. The record is not very clear on this question. We think, however, that the fair purport of the record is that the case was tried on the equity side, and that the attitude of all parties in that regard was an acquiescent one,—at least at the time of the beginning of the trial. The record seems to disclose some later protest.

As above indicated, two questions are presented, and the burden is upon the cross-petitioners to establish the affirmative of each. The statute seems to contemplate a separate hearing for each issue. If these issues had been tried separately, either party would have been entitled to a trial by ordinary proceeding as to the first issue. The second issue would necessarily be. tried by the same kind of a proceeding as was had in the original trial. Such proceedings would be determined by the nature of the cause of action presented by the cross-petitioners. The

cause of action thus presented in this case was an equitable one, and triable on the equity side. In the case at bar, these two issues were not tried separately in the district court. It was entirely competent for the parties to waive separate trial on such issues, and to try both in one hearing. In order to try them both together, it was unavoidable that they be tried on the equity side. We think it equally unavoidable that they be so considered here.

II. The theory of circumstantial evidence, upon which appellants rely as proof of fraud in the concealment of the deed, is that, at the time of the death of Henry Dolph, the deed in question was in the Bank of Malvern, with the papers of Henry Dolph; that Mrs. Dolph secretly obtained all such papers, including the deed from the bank, these papers being encased in envelopes, and the bankers being ignorant of what the contents of the envelopes were; that she thereafter carefully concealed such deed upon her own person, though pretending to search repeatedly therefor; that, after obtaining a favorable decree in the district court, and while the case was pending here on appeal, she fraudulently contrived and pretended to make discovery; that she placed the deed in a vest formerly worn by her husband; that she thereafter gave the vest to her visiting sister from Kansas, for the use of her husband; that such sister or her husband pretended to discover such deed, some weeks later, in such vest, and so notified one Gidley (the son of Mrs. Dolph by a former marriage); and that Gidley went to Kansas upon the pretense of obtaining such deed; and that, so pretending, he obtained and presented said deed to Mrs. Dolph's counsel, who thereupon informed the opposing counsel of the discovery,— all of which resulted in the filing of a stipulation in this court making such deed a part of the record here.

3. NEW TRIAL: grounds: fraudulent concealment of deed.

It was discovered, after stipulation, that there was a mistake made by the scrivener in the description of Section 8, in that the deed located the same in Range 42 instead of Range 40. The theory of fraud at this point is that the scrivener's mistake in this regard had been immediately discovered by Henry Dolph when the deed first came into his hands; that he corrected the same; that, after the death of Henry Dolph, the

plaintiff, either personally or by her connivance, erased such correction, so as to leave the deed in its original mistaken form. The description as originally written at this point was "Forty-two (42)." The theory put forward by appellants is that Henry Dolph corrected this error by drawing a line through the word "two," and also through the figure "2," and by inserting over the figure "2" a cipher; that the lines thus drawn by Henry were made either with a pen or a pencil; and that the alteration consisted in the erasure of such lines thus made by Henry.

As to the disclosure of a cause of action for the appellants, the theory of appellants is that the alleged correction of the deed made by Henry was effective to make the deed valid, as a conveyance of the intended Section 8, and that the subsequent fraudulent alteration of such correction could not destroy such validity; and that the newly discovered evidence on the question of delivery so fortified the former evidence on the same question as to create a clear preponderance thereon in favor of appellants.

We have already indicated that the burden was upon the appellants to establish the affirmative as to each of the questions heretofore stated. A failure to establish either is fatal as to both. A very careful reading of the evidence, stimulated by the great importance of the case, brings us all to the conclusion that the evidence is clearly insufficient to establish either. In view of the fact that the evidence was discussed by us quite fully in our former opinion, and that our present conclusion is in accord with the finding of the district court, we shall not undertake now a detailed discussion of the evidence, further than to indicate two or three of the more salient features of the record which bring us to this conclusion.

III. The appellants' circumstantial theory of fraud as to the concealment of the deed is predicated upon the initial hypothesis that the deed *was* in the Bank of Malvern at the time of Henry's death. From such assumed fact, it is inferred that it was left there for the benefit of Hiram. There is no direct evidence in the record that the deed was in the Bank of Malvern at the time of Henry's death. On the contrary, the direct evidence contradicts such hypothesis. To establish such hypothesis, appellants rely only on other circumstantial evidence, which is

neither conclusive nor cogent. There is no direct evidence that Mrs. Dolph ever had the deed in her conscious possession. Circumstantial evidence is relied on here also for proof. She did have possession of the vest, in the pocket of which the deed was afterwards found, as contended by appellees. This is a proper circumstance, and might become a very persuasive one, if otherwise supported. Appellants' main reliance at this point is upon the testimony of the witness Stokes. We have read it carefully. We shall not take the space to analyze it. It is sufficient to say that it will not bear analysis, and that the circumstance testified to by her is too indefinite and unsubstantial to bear the weight imposed upon it by the theory of appellants.

If there *were* a concealment of the deed in the first instance, yet its later production, with consent that it be made a part of the record on the pending appeal, gave to appellants the full benefit of it. While the moral and legal turpitude of such concealment, if any, would remain, yet it could not, in and of itself, thereafter constitute a ground for new trial. This is not saying that the original concealment could not be so connected with other events as to continue the combined efficacy of all as a ground of a new trial. The original concealment, if such, in this case furnished the plaintiff an opportunity to perpetrate the alleged alteration of the deed. If such alteration were satisfactorily proved, then the fraudulent effect of the original concealment would continue, notwithstanding the later production of the deed. The offered proof of the fraudulent alteration consists of evidence tending to show the *corpus delicti*. The new evidence contains the testimony of witnesses to the effect that they saw the deed in the hands of Henry Dolph shortly after its execution, at the time when the alleged delivery to Hiram was made; that, at that time, Henry said that a mistake had been made by the scrivener, in giving the number of the range as "forty-two," and that he had corrected the same; that the witnesses saw the correction, and observed that a line had been drawn through the word "two" and through the figure "2," and a cipher written above the figure "2," and that this had been done either with a "pen or pencil." No such lines or erasures appeared upon the deed when it was produced; therefore, if they ever existed, they must have been erased by some person.

This evidence of the *corpus delicti* is very direct. From its very nature, it is not capable of contradiction by other direct evidence. Its credibility, therefore, ought not to be taken for granted without careful scrutiny. The witnesses testifying are the parties in interest. They were all witnesses upon the original trial. At that time, the deed was supposed to be a lost instrument, and its existence and *contents* were proved by the oral testimony of these witnesses. None of them at that time testified to the circumstance of the alleged correction. It is true that no question of alteration was under consideration at that time. No one connected with the case claims to have known of such alleged correction by Henry Dolph, except these witnesses. Interrogation of the witnesses, therefore, was not specifically directed upon the original trial, to the question of correction. Yet it was incumbent upon the cross-petitioners upon that trial to establish the *contents* of the lost instrument. They did purport to testify to such contents, to the effect that the description contained in the lost instrument included Section 8, in Township 71, Range 40. They testified to circumstances that aided their present recollection. They purported also, at that time, to testify to the conversation had between Henry and Hiram in their presence. The facts now testified to were a very important part of the circumstances and the conversations then had. It is not easily credible that the witnesses could have forgotten such conversation and circumstances at the time of the original trial, if their memory of the facts to which they *did* testify was really trustworthy. The fact that this circumstance was not touched upon by any of these witnesses at the original trial seriously challenges the credibility of the evidence now, and strongly suggests the possibility that the witnesses are self-deceived now by a willing memory as to what really occurred at that time.

It must be said, also, that the deed itself, which is now in evidence, furnishes a mute contradiction to the testimony. The original instrument is before us. If a correction thereof had formerly been made in the manner indicated, and if such correction had been thereafter erased, it would seem a fair probability that some evidence of such processes would still remain upon the face of the paper. It is not seriously claimed that

any such evidence is apparent to the naked eye. It is contended that the microscope reveals the evidence upon the face of the paper. The deed and the microscope were presented to many witnesses who testified at the hearing. As to the witnesses testifying thereon, the clear weight of numbers is against the cross-petitioners. Our own careful observation of it under the microscope confirms the views of such majority.

Counsel call our attention to a point or a spot upon the face of the instrument, which indicates under the microscope that the surface had been sometime roughened, as though an eraser had been used thereon. This spot is located slightly above and to the right of the letter ''o'' in the word ''two.'' It appears also that the outside curve of the letter ''o'' is to some extent deficient in ink. This is all that appears upon the face of the instrument, tending to prove the *corpus delicti*. Nothing appears thereon, tending to indicate any disturbance of the surface of the paper upon the Arabic number ''42'' or upon the word ''two,'' unless it be upon the outside curve of the letter ''o.'' Assuming that the existence of the spot to which our attention is directed indicates that a rubber eraser had been placed upon it, what probative value can the existence of such a spot have for the appellants? It could be created in a mere moment by anyone who cared to put an eraser to the paper. The inference claimed for it is that it puts the plaintiff under suspicion, at least. But if the existence of such a spot is to be deemed advantageous to the appellants as a matter of evidence, they come themselves at once under the same inferential suspicion as they direct against the plaintiff. The mere existence of the spot proves nothing. The importance of it, if any, is, Who put it there, and why? Granting that the plaintiff had a motive for the alteration of the instrument; likewise, the cross-petitioners had a motive to make it appear that she did alter it. We absolve both parties from any such suspicion. We see no probative value in the existence of this spot. It is not unlike other spots upon the face of the same paper. It is not, in fact, located upon the area of the alleged alteration.

The conclusion, therefore, is unavoidable that the instrument itself is conclusive evidence of its contents as originally

written, and that its present condition is quite as conclusive that its original contents have never been changed by correction.

IV. Though our conclusion announced in the foregoing division is, of itself, quite fatal to the cross-petitioners, we may say that, in our examination of the record, we have not been indifferent in our consideration of the new evidence of delivery. There is no doubt, under the evidence, that the instrument in question was executed by Henry Dolph, with the view of eventual delivery to his brother Hiram. Henry did intend that, after his death, this land should pass to Hiram. What may be termed the "fireside equities" are clearly with the cross-petitioners. These have appealed to us with a strong pull, and we have not been brought to an adverse conclusion by our own preference. Except during three years of army service by Hiram, the two brothers had touched elbows throughout their lives. They married sisters. When Henry reached the western slope of life, he found himself childless and rich. Hiram had a large and worthy family, and was comparatively poor. Henry's wife died in June, 1894. The deed was executed in August, 1895. He was married to the present plaintiff in June, 1896. At the time the deed was executed, Henry owned between 1,200 and 1,300 acres of land. He thereafter acquired 600 or 700 acres more. It seems to have been the expectation of both brothers that Hiram would outlive Henry. This assumption entered into all talk and understanding concerning the proposed gift of land. But Hiram did, in fact, predecease Henry, in July, 1915. At that time, this deed had been in existence for 20 years. It was not then in Hiram's possession or in his control, so far as appears from the record. The new evidence on the question of delivery is largely cumulative, and corroborative of the testimony on the original trial. One of the greatest difficulties in the way of finding delivery does not so much rest upon the verbal evidence of the witnesses on either side, but rather inheres in the very facts established by the appellants themselves.

Delivery of an instrument, as we have often said, is a question of intention, and this is so whether there be actual manual possession or not. Manual possession is evidence of delivery and

<p style="margin-left:2em; font-size:smaller">4. DEEDS: execution without delivery.</p>

5. DEEDS: condi-    intent to deliver, but it is not conclusive as
tional delivery.    such.  Throughout all the evidence for appel-
lants, both old and new, the fact stands out that at no time did
Henry intend to surrender his dominion over his property
while he lived.  Henry was to continue in possession as long as
he lived, and did so continue.  There is no dispute about this.
This purpose and understanding would have been consistent
with a present conveyance of the fee, *reserving to Henry a life
estate*.  The deed was not so drawn.  It is a full warranty deed,
in statutory form, with full covenants of warranty.  It is claimed
that the deed was delivered in August or September, 1895.  If
so, then Hiram became vested thereby with full title and im-
mediate right to possession, and could have enforced his right
thereunder at that time.  If the heirs are entitled to maintain
their present action under this deed, Hiram was entitled to
maintain the same action in .1895.  Henry could have inter-
posed no defense to such an action, except by obtaining a
reformation of the deed, to conform to the oral understanding
of the parties, as the appellants now testify such oral under-
standing to be.  To adopt the appellants' theory of delivery,
therefore, in September, 1895, is to say that Henry occupied
the land for 20 years under the mere sufferance of Hiram;
whereas, in fact, it appears without dispute that he continued
to occupy the land under claim of right on his part, and without
dispute of such a claim by Hiram.  An immediate delivery of the
deed in the form in which it was drawn, therefore, would not
carry out the real intent and understanding of the parties, but
would, in fact, be contrary thereto.  In other words, the deed,
in the form in which it was drawn, could serve the purpose of
the grantor only by *delaying* its delivery until the end of his
life was imminent.  To have delivered the deed in September,
1895, would have been to confer upon Hiram a greater gift than
was ever intended.  If the deed had been drawn with a reserva-
tion therein of a life estate to the grantor, the case of appel-
lants would be much stronger, in that a deed in such form would
be in conformity with the admitted intent and understanding
of the parties, and would, on its face, tend to show an intention
of present delivery.  Such was the case of *McKemey v. Ketchum*,
188 Iowa 1081, which is much relied on by appellants in their

brief. It appearing without dispute, throughout the testimony for the appellants, that, by the oral understanding and intent of the parties, Henry was to retain a life estate, the only way that he could retain it, under this deed, was to hold its delivery in abeyance, or else to surrender its control to a third party, with directions to deliver after his death.

Another fact stands out in appellants' evidence which has its significance. The evidence for the appellants tended to prove delivery, not only in August or September, 1895, but tended, in like manner, to prove a later delivery in 1901, and a third delivery in February, 1911, and a fourth delivery in August, 1911, and a fifth delivery in October, 1911. And yet, throughout all these successive deliveries, Henry was always in the undisputed control of the deed, and finally died with the deed in his pocket. If there was a first delivery in August, 1895, within the intention of the grantor, why should there have been a second delivery? To prove a delivery in 1901 was to prove impliedly that there had been no previous delivery; and this is a significance which attaches to each alleged successive delivery. Appellants' case would be stronger with proof of *one* delivery than with proof of *five*. It does appear from appellants' evidence that, in August, 1911, Henry was very sick, and that, at that time, he handed the deed to Hiram, saying: "If I do not get well, you put it on record." But this delivery purported to be conditional. Henry *did* get well, and Hiram returned the deed to him. Indeed, the evidence for appellants is permeated with the fact that Henry at all times maintained his dominion over the deed itself, and this applies to the new evidence, as much as to the old.

It it quite possibly true that Henry may have believed that delivery of the deed after his death would be effective. If this be assumed, it would explain some inconsistencies in the record, but it would not aid the appellants in establishing the fact of delivery *before* death. This is, perhaps, a sufficient indication of the salient reasons why we are confirmed in the conclusion originally reached by us on this question. In giving such consideration to the case now, in the light of the newly discovered evidence, we have, in moral effect, given to the appellants the benefit of a new trial, although we hold, in the preceding divi-

sion, that they are not entitled to it.  The judgment entered below must, accordingly, be affirmed.—*Affirmed*.

STEVENS, ARTHUR, and FAVILLE, JJ., concur.