JAMES D. BRIEN, Administrator, Plaintiff, Appellee, v. W. R. DAVIDSON et al., Defendants, Appellants, LIDA DAVIDSON et al., Defendants.

No. 44238.

596

August 5, 1938.

Opinion Modified and Rehearing Denied November 25, 1938.

W. M. McLaughlin, Parrish, Guthrie, Watters & Colflesh, and A. L. Heminger, for appellants.

R. J. Harwood and McBeth & Stong, for appellee.

SAGER, C. J.—The defendant Lida is the widow of G. W. Davidson, and the appellants, except one, are their children. The exception is Richard Scott, a grandson.

During the trial it developed that Richard was a minor, and Thomas J. Guthrie, one of defendants' counsel, was named as his guardian *ad litem*. The appointment so made is the subject of complaint which will hereafter have attention.

The property of the estate of Davidson was handled for approximately three years after his death, which occurred May 9, 1928, by the heirs without administration. On April 20, 1931, the widow was appointed administratrix and found the estate to consist very largely of worthless notes, amounting to several thousand dollars. During the period of four years during which she so acted the amount realized in the estate was only $1,024.08. Before the occurrence of the events narrated a claim was allowed against the estate on a capital stock assessment of a bank with which the deceased had been connected, in the sum of $8,200 with interest at 6 per cent from January 12, 1931. After the filing of this claim a citation was issued against the administratrix and the heirs of the estate, whereupon the administratrix filed her report and resigned. Plaintiff was appointed, and this action was brought under the authority given him by the district court.

The record is long, the printed abstract and amendment covering nine hundred pages, with several hundred exhibits, and it would be an impossible task to set out even a small part of it. This we deem unnecessary because a considerable portion of the testimony consists of evidence given by questioned document experts. These, through many pages, pointed out the reasons that impelled them to the conclusions announced. Three such experts testified for the plaintiff and three for the de-

fendants. As we see the controversy before us, it turns upon a fact question, and an examination of the testimony in detail would be of no value to the bench or bar of the state.

The decedent was the owner of the instruments under examination on December 1, 1927. Defendants claim that on that date he executed, with at least three other conveyances, the instruments hereinbefore referred to. One feature upon which the court very properly laid considerable stress was the fact that the signatures on five of the instruments can be perfectly superimposed, except one which showed a slight break in the signature, indicating perhaps that the paper had slipped during the process of forging. There appear to have been used in the alteration of the instruments two typewriters of different makes, which were kept in the office of one of the defendants, and so far as appears are still in his possession but were not produced at the trial: Another feature which attracts attention in an examination of the exhibits is the fact, apparent on the face of all the questioned documents but one, that the date was originally December 1, 1928, and in the instruments under examination the figure "7" was typed over the place where the "8" had been. The significance of this is that December 1, 1928, was after the death of Davidson, while December 1, 1927, was just a few months before he died.

The questioned documents, and many that bore the admittedly genuine signatures of Davidson, were enlarged by photographic or other process known to the experts in this line, and differences in shading, in line quality, in line tremor or the absence thereof, and many other details, were pointed out; and the differences made to appear went to an extent which led the experts of the plaintiff to declare the instruments forgeries by tracing. The experts of the defendants testified that the signatures were genuine. We need not say, we think, that to point out these features would be an utterly hopeless and useless task. It merely was a question, on this branch of the case, of which of the experts were the more credible, in the light of their analyses of the various exhibits. The court took the view that the greater weight of the testimony lay with plaintiff's experts. This, against the testimony on the other side, with the many circumstances appearing in the record, led the court to find and decree that plaintiff had sustained the burden of proof. With this conclusion we agree. A reading of the testimony

of these witnesses persuades us that plaintiff's experts were better qualified than those for the defense. In any event, it was a question of fact on contradictory evidence, and we do not find that the court was not right in viewing it in the way it did.

Other matters in the record will have notice as we proceed. We have given all the propositions urged by the parties attention, but not all of them will be discussed. We devote our attention to those which seem determinative of the case, in the order best calculated to keep this opinion within a reasonable length.

As their first proposition defendants say that, this being an equity case it is triable *de novo* and that this court will determine it on its merits both as to the law and the facts. We refrain from setting out the authorities cited, because the rule needs no citation to support it.

The second proposition is that the certificate of the notary is presumptively true and that the presumption is a strong one, demanding clear and convincing evidence to contradict it. This, too, is a well-known rule of law, and we omit citation on that point.

Again, defendants say that a written instrument acknowledged before a notary is valid and binding, even though the name may have been written by another; and cite, among other cases, Currier v. Clark, 145 Iowa 613, 124 N. W. 622, and McColl v. Jordan, 200 Iowa 961, 205 N. W. 838, both of which sustain the proposition laid down.

Hamilton, J., in First Trust Joint Stock Land Bank v. McNeff, 220 Iowa 1225, beginning at page 1229, 264 N. W. 105, made an extended examination of the cases touching this particular subject, and we are not called upon to go over the same field now.

Since plaintiff relies upon the testimony of experts, defendants argue as another ground of complaint on this appeal, that evidence of expert witnesses based on comparison of signatures is of the lowest order and most unsatisfactory, is not conclusive, and is the merest guesswork. In support of this they cite a number of our cases in which a certain disparagement of expert testimony will be found. Some, or all, of these, however, will be found to deal with that class of testimony, as in malpractice cases, which must of necessity be largely speculative and at best the opinion of the expert. But that testimony of the kind

before us is receivable there can be no doubt, either under our own cases or those of other jurisdictions.

In Murphy v. Murphy, 146 Iowa 255, at page 261, 125 N. W. 191, at page 193, we said:

"The theory on which expert witnesses are permitted to testify is that the handwriting is always in some degree the reflex of the nervous organization of the writer, which, independently of the will, and unconsciously, causes him to stamp his individuality in his writing. In re Gordon's Will, 50 N. J. Eq. 397, 26 Atl. 268. The value of such evidence depends largely on the identification and number of similar characteristics or lack thereof between the disputed writing and the standards. The appearance or lack of one characteristic may be accounted as a coincidence or accident, but, as the number increases, the probability of being a mere coincidence or accident disappears, and conviction as in cases of circumstantial evidence may become irresistible."

We recognized the advance in the field of expert testimony when, in Keeney v. De La Gardee, 212 Iowa 45, 235 N. W. 745, Judge Evans, speaking for the court, had this to say (page 53 of 212 Iowa, page 749 of 235 N. W.):

"We are not unmindful of the fact that, since our original pronouncement in the Whitaker case, 42 Iowa 586, much progress has been made in the means and methods of detecting forgeries. By miscroscopic inspection and by magnified photographs and sometimes by chemical tests, the expert may be able to discover and to demonstrate the existence of facts which negative the genuineness of the signature. Such facts, when proved, become substantive evidence, rather than mere expert opinion."

In Fekete v. Fekete, 323 Ill. 468, 154 N. E. 209, it was said (page 215):

"While opinion evidence based upon hypothesis has been held to be of but little value, the opinion of an expert may be of great value where it calls the attention of the court to facts which are capable of verification by the court which the court otherwise would probably have overlooked, and the opinion of the expert is based upon such facts and is in harmony therewith."

And this, from a New York court, in In re Burtis' Will, 43 Misc. 437, 89 N. Y. S. 441, at page 444, might well have been written on the record in this case:

"The contestants depend largely upon their evidence bearing upon the question of handwriting in support of their case, and it is evidence of this character which makes up a large part of the testimony.

"Much has been said and written concerning the value of expert evidence, and there is a disposition to belittle the utility of evidence of this character. Of course, in cases where the handwriting or signature of a person, since deceased, is attacked as a forgery, the party defending it is apt to ridicule the value of expert evidence, because almost invariably evidence of this character is the only kind available to the party attacking the signature. He often has no other means at hand to show to the court or jury that the signature may be or is a forgery, while, on the other hand, the party defending the signature usually has the aid of one or more witnesses to testify to the fact of the signing, etc. If the court were to adopt the view that expert evidence is of little value and disregard it, the party attacking the signature ordinarily would have but little chance of success, and it would create unlimited opportunities for designing persons to forge the name of deceased persons to important documents and then swear it through. The court or jury should not ignore this class of evidence, but should examine it as carefully as any other in the case, as it may be that by that evidence the court is able to reach a satisfactory conclusion. It is urged that we will find as many experts testifying upon one one side as upon the other. That may be true, and it is also true that we will find as many lay witnesses upon each side in litigated cases, giving different versions concerning a fact or circumstance. But this does not signify that the evidence of those witnesses must be disregarded because they disagree. Nor is it important specially which side has the greater number of expert or lay witnesses sworn in his behalf. It is the nature or character of the testimony given by the witness which is important. In the case of expert witnesses, their opinions are valuable only in so far as they point out satisfactory reasons for the ultimate conclusion of the witness. If the witness simply testifies that he believes the signature genuine, or not genuine,

as the case may be, and gives no reasons for reaching his con-
clusion, his opinion is valueless, and the court will not consider
it. If he gives reasons for his opinion, then it is the duty of
the court to examine into and analyze those reasons, and de-
termine the correctness or incorrectness of the opinion, and
not simply consider the conclusion of the witness alone.''

Defendants argue that plaintiff had the burden of im-
peaching the acknowledgment, and complain that no evidence
was offered on this subject. The argument seems to proceed upon
the theory that the acknowledgment in and of itself was suf-
ficient to establish defendants' claim that the questioned docu-
ments were in fact the genuine and voluntary act of the deceased.
In line with this view defendants argue that the testimony of
the expert witnesses was incompetent and immaterial under
the record, which ''conclusively shows the instruments in ques-
tion are in due form and duly acknowledged, and no evidence
whatever was offered by plaintiff to contradict or overcome its
verity.'' This overlooks many features of the record which tend
to cast doubt upon defendants' contentions, when the record
is considered as a whole.

In Schulte v. Ideal Food Prod. Co., 203 Iowa 676, 213 N. W.
431, we said (page 677 of 203 Iowa, page 432 of 213 N. W.):

''We have consistently held that a mere failure to produce
direct contradiction to the testimony of a witness does not
necessarily entitle such testimony to be deemed true. It must
still stand the test of credibility, in the light of all the cir-
cumstances surrounding the transaction. This is particularly
true in those cases where, from its very nature, no evidence is
available to the adverse party to contradict such testimony.
* * * Circumstances may be produced and relied on to show
improbability and unreasonableness and inconsistency, and the
nature of such circumstances is as varied, and the scope thereof
as wide, as the field of human affairs.''

See, also, McDonald v. Yellow Taxicab Co., 192 Iowa 1183,
at page 1193, 184 N. W. 291.

In the case of First National Bank v. Hartsock, 202 Iowa
603, 210 N. W. 919, we quoted from Jones v. McGruder, 87
Va. 360, 12 S. E. 792, 798, as follows (page 604 of 202 Iowa,
page 920 of 210 N. W.):

"A transaction may, of itself and by itself, furnish the most satisfactory proof of fraud, so conclusive as to outweigh the answer of the defendants, and even the evidence of witnesses. The circumstances attending and following a transaction are often of such a character as not to leave even a shadow of doubt as to the real object and motive of the parties engaged in it. * * * The motives and intentions of parties can only be judged of by their actions and the nature and character of the transaction in which they are engaged. These often furnish more conclusive evidence than the most direct testimony."

It is manifest that the notary's certificate is not conclusive. Our statute expressly so holds (Code, section 11293). See, also, Stitzel v. Miller, 250 Ill. 72, 95 N. E. 53, 34 L. R. A. (N. S.) 1004, Ann. Cas. 1912B, 412.

■ It is insisted that because the instruments were in the possession of the defendants, or one of them, there is a presumption that they were delivered. A large number of cases are cited to that point, and they so hold; but none of them excludes the possibility that circumstances may overcome this presumption, and it would seem to go without argument that this would be true in case the instruments were forgeries.

In Lathrop v. Knoop, 202 Iowa 621, at page 623, 210 N. W. 764, at page 766, we said:

"In whatever form delivery is accomplished, there must be the intention of the grantor to transfer title, without any reservation of control thereover. (Citing cases.) The decisions of this court holding that delivery is largely a matter of intention are too numerous to enumerate, but see Dolph v. Wortman, supra [185 Iowa 630, 168 N. W. 252]; Leighton v. Leighton, 196 Iowa 1191, 194 N. W. 276; Dolph v. Wortman, 191 Iowa 1364, 183 N. W. 814; McKemey v. Ketchum, 188 Iowa 1081, 175 N. W. 325; Kyle v. Kyle, supra [175 Iowa 734, 157 N. W. 248]; Wilson v. Wilson, 99 Iowa 688, 68 N. W. 910."

■ Defendants assert that declarations in regard to the transfer of property made by the grantor at or about the time of the execution of the instrument are part of the *res gestae*, and such evidence should not be disregarded. This may be conceded to be the rule in a proper case, and defendants cite authorities to sustain it; but in the case before us we find a dis-

tinct absence of competent or convincing evidence to evoke its application here.

Notwithstanding the great length of the abstract and the amendment thereto we have resorted to the transcript and have read the testimony of defendants' witnesses (other than the experts) in order that we might form our own impressions from the testimony on question, objection, and answer, as the record was made below. It is not possible to give the lights and shadows appearing therein, and we will not attempt it, but such reading, and a consideration thereof, with all the rest of the evidence, persuades us that the court was right in its conclusions and in its decree.

A part of the testimony which we assume to have been intended to cover this proposition is that of one Gladys Wadsworth. She is a school teacher, who in 1927 boarded at the home of a neighbor of the Davidsons. She testified that she was accustomed to go to the latter home frequently, and recalled that some time in November 1927, she went over there to play cards. At that time she found Davidson, according to her statement, seated at the dining-room table finishing some papers, and when greeted by the witness he made the remark that he was finishing some papers as some gifts to three members of the family and a nephew, and that when he had finished his papers he would play bridge with them as had been planned. The witness did not claim to have seen the papers, and nowhere attempted to identify whatever she saw with the documents under examination in the case before us.

Roy Davidson, one of the defendants, remembered being at the home of his father at the time Miss Wadsworth mentioned, but he did not attempt to tell what was in the instruments. He made no effort to point out that the conversation, if it occurred, had to do with the documents here involved. Later in his testimony he went on to speak, as did his brother and codefendant, W. R. Davidson, of the delivery of a deed to him by his father.

The widow, present also at the time of the alleged conversation, in no way connected the instruments so as to make her evidence of any importance on this subject.

W. R. Davidson was not present at the time but he, like his brother Roy, as indicated, gave direct testimony of the delivery of these instruments to them at W. R.'s place of business. This evidence was received subject to the objection that the witnesses

were incompetent under section 11257 of the Code. The objection was good, and the trial court was bound to ignore the testimony, as we do also. That it was a personal transaction with a person since deceased may not be disputed. While there is some argument to the effect that the statute has fallen into ill-repute, it nevertheless remains as a legislative enactment that may not be disregarded because of its inconvenience or the difficulty of applying it.

One other proposition only seems to merit specific attention, and that is to the effect that the court disregarded the rights of the minor by failing to extend to him the protection to which he was entitled as a matter of law. This can mean only that the court was in error in appointing the guardian *ad litem* after the case had proceeded for a considerable time rather than before the trial began. As applied to the case before us this criticism is without merit. It was not known that Scott was a minor until after considerable testimony had been taken, and when it was discovered the court promptly appointed Thomas J. Guthrie as his guardian. Mr. Guthrie is a member of the firm which, with other attorneys, had the defendants' case in hand and tried it throughout, and so far as the record appears Mr. Guthrie was present all the time and fully cognizant of everything that had transpired up to that point, and while acting for the others was defending Richard Scott's interest as fully and completely as if he had been his guardian *ad litem* from the beginning. More than that, there is no showing of prejudice at any time, and no effort was made to point out wherein the interest of the minor was damaged by the appointment being made at the time it was. See, Jones v. Schaffner, 193 Iowa 1262, 1275, 188 N. W. 787; In re Will of Wiltsey, 135 Iowa 430, 109 N. W. 776; Jones v. Clyman, 193 Iowa 1248, 188 N. W. 954.

The other complaints made by the defendants and the contentions made by the plaintiff are covered in what has gone before.

The length of the record and the burden imposed upon the court in its reading suggest that we remind the members of the profession to observe the requirements of the rules in abstracting cases: "Preserve everything material to the question to be decided and omit everything else." Nonobservance is of

growing frequency, adding to the labors of the court, with no corresponding advantage to attorneys or litigants.

From a careful consideration of the entire record we are persuaded that the decree of the trial court is right, and it is affirmed.—Affirmed.

KINTZINGER, ANDERSON, HAMILTON, DONEGAN, STIGER, RICHARDS, and MILLER, JJ., concur.