THOMAS L. FEKETE, Appellee, *vs.* THOMAS LEBEAU
FEKETE *et al.* Appellants.

*Opinion filed October 28, 1926—Rehearing denied Dec. 16, 1926.*

1. EQUITY—*section 52 of Practice act, as to denial of written
instruments, does not apply to chancery suits.* Section 52 of the
Practice act, providing that the execution of written instruments
cannot be denied on trial if not denied under oath in the plead-
ings, does not apply to chancery suits, and defendants to a suit to
enforce an alleged declaration of trust may be permitted on the
trial to deny the valid execution of the instrument relied upon
although their answer is not under oath.

2. SAME—*chancery practice is governed by Chancery act except
as otherwise expressly provided.* The practice in chancery is regu-
lated by the Chancery act except so far as is otherwise expressly
enacted or necessarily implied by subsequent legislation, and no
part of the Practice act has any reference to the mode of pro-
cedure in chancery cases except in so far as the language expressly
or by clear implication refers to such procedure.

3. BURDEN OF PROOF—*burden is on complainant to prove execu-
tion of alleged declaration of trust—forgery.* Where proof of the
valid execution of a declaration of trust is essential to the com-
plainant's suit in equity and is the foundation of his bill the burden
is on the complainant to prove the valid execution of the instru-
ment, and denial of its execution does not constitute a charge of
forgery such as must be proved by the defendants beyond a rea-
sonable doubt, as such proof is required only of parties charging
a crime in their pleadings.

4. APPEALS AND ERRORS—*appellee must assign cross-errors.* Er-
rors of the trial court committed in rulings adverse to an appel-
lee are not available to him where he has assigned no cross-errors.

5. EVIDENCE—*opinion evidence as to handwriting is of little
value.* Opinions as to the genuineness of handwriting are at best
weak and unsatisfactory evidence, as there is much room for error
and great temptation to form opinions favorable to the party call-
ing the witness.

6. SAME—*when opinion evidence is of great value.* While opin-
ion evidence based upon hypothesis has been held to be of but little
value, the opinion of an expert may be of great value where it
calls the attention of the court to facts which are capable of veri-
fication by the court and which the court otherwise would probably

have overlooked and where the opinion of the expert is based upon such facts and is in harmony therewith.

7. TRUSTS—*when a decree will be reversed for failure to prove declaration of trust.* A decree will not be reversed unless manifestly against the weight of the evidence if the cause has been heard in open court, but where the complainant's case is based on an alleged declaration of trust and the reviewing court is of opinion, from an examination of documents and photographs in evidence for comparison of handwritings, that the signature to the declaration is not the true signature of the declarant, a decree granting the prayer of the bill to enforce the trust will be reversed.

APPEAL from the Circuit Court of St. Clair county; the Hon. LOUIS BERNREUTER, Judge, presiding.

C. E. POPE, and H. F. DRIEMEYER, for appellants.

KRAMER, KRAMER & CAMPBELL, and RALPH F. LESE-MANN, for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

Thomas L. Fekete filed a bill in the circuit court of St. Clair county to compel Forrest F. Fekete, in accordance with an alleged declaration of trust made by him, to convey to the complainant certain real estate in the city of East St. Louis. The defendants answered denying the execution of the declaration of trust by Forrest F. Fekete and filed a cross-bill, in which they prayed to have the declaration of trust removed as a cloud on the title, as well as a certain deed which Forrest had on December 6, 1920, signed in blank as to the name of the grantee and acknowledged but in which the name of Charles O. Hale was subsequently written as grantee without authority. The cross-bill sought to set aside also a deed of Hale conveying the premises to Emily M. Fekete, trustee, and a deed of Emily M. Fekete, trustee, to Thomas L. Fekete, her husband. The cross-bill was answered, the evidence was heard by the chancellor, and from the decree which he entered dismissing the cross-bill for want of equity and granting the relief prayed for in

the original bill, the defendants in the original bill, who
were also the complainants in the cross-bill, have appealed.

The case turned on the question of the execution of the
declaration of trust. All the defendants to the original
bill, six in number, were the children of the complainant,
Thomas L. Fekete. The following facts are not disputed:
Dr. Alexander Fekete, who was the father of the appel-
lee, Thomas L. Fekete, formerly owned the property and
resided in a brick residence which was situated on it
and fronted on Collinsville avenue. Dr. Fekete's wife,
Sarah C., owned an adjoining lot on the east, which
fronted on Fifth street. In the year 1900 the brick resi-
dence was removed to the Fifth street lot, and a new build-
ing, consisting of store-rooms with flats above, was erected
on the lot, fronting on Collinsville avenue. The cost of
this improvement was derived chiefly from the proceeds
of a loan for $10,000, secured by a mortgage on the prop-
erty. Dr. Fekete was the post-master at East St. Louis and
was not then practicing his profession. He and his wife
occupied an apartment on the second floor of the new build-
ing until his death, on February 27, 1911, and his wife con-
tinued to live there until her death, in 1919. By his will
Dr. Fekete left all his property to his wife, but directed
that if any part of it were not disposed of during her life-
time it should go to the appellee and Ida M. F. Lancaster,
who was his daughter and died in his lifetime. The ap-
pellee was engaged in the real estate, insurance and loan
business in East St. Louis. After the erection of the new
building on Collinsville avenue he managed the property,
renting the stores and offices in the Collinsville avenue
building and the brick residence on Fifth street and col-
lecting the rents but rendering no account to anyone. The
$10,000 mortgage was increased in 1904 to $12,000, in
1915 to $17,200, and has since been increased to $25,000.
The appellee became insolvent, losing all his property, in-
cluding his home. Judgments were obtained against him

which were not satisfied, some of them being for the principal of mortgage debts belonging to other people which he had collected and failed to pay over. In 1915 he was indebted to insurance companies which he had previously represented, and his son, Thomas L. Fekete, Jr., paid his obligations and succeeded him as agent. On May 4, 1915, Sarah C. Fekete, the appellee's mother, conveyed both the Collinsville avenue property and the Fifth street property to Charlotte J. Fekete, the appellee's wife. The appellee continued in the management of the property without rendering any account of the income. On December 4, 1920, Charlotte J. Fekete and the appellee, her husband, conveyed the property to their son, Forrest F. Fekete, by an ordinary quit-claim deed in statutory form. The grantee in the deed was designated as Forrest F. Fekete, trustee, but there were no words in the deed indicating the nature of the trust. Two days later Forrest, as grantor, signed and acknowledged a quit-claim deed of the same property, in which the name of the grantee was left blank. There was no change in the use or management of the property. The appellee continued until January, 1925, in the management of the property as agent and not as owner, just as he had done before. He paid all the expenses for repairs, taxes and insurance and retained the balance of the money for his own use, expending it as he saw fit. He supported Forrest and cared for him, as he had done from the time he was born, giving him $15 a week as spending money. Forrest was afflicted with epilepsy, had never married but had lived with his parents until his mother's death and afterward lived with his father in an apartment in the Collinsville avenue property. He died a few weeks after the beginning of this suit, being thirty-two years old. The appellee had his office in the building on Collinsville avenue, having with his son Thomas a suite of four rooms, each having a private room. The other rooms were used by both. Forrest had a desk in the appellee's office. None

of the appellee's children ever made any claim of interest in the property until January, 1925.

Charlotte J. Fekete died on April 8, 1923, and on April 12, 1923, her deed to Forrest F. Fekete, trustee, was filed for record. On December 10, 1924, the appellee married Mrs. Emily M. Brown. The appellee, who had been living in an apartment in the Collinsville avenue property, desired to purchase a residence in Signal Hill, a suburb of East St. Louis, and in the course of the negotiation for that purpose arranged to obtain a loan of $2000. On January 2, 1925, at his request, Forrest executed a note for that amount and six interest notes of $60 each, together with a real estate mortgage securing them on the Fifth street property. The loan was not consummated, because Forrest, after having signed the mortgage and notes, came to the bank and asked for the return of them and said he wanted to withdraw from the transaction. After Forrest's withdrawal from the effort to obtain the loan the appellee inserted the name of Charles O. Hale, the janitor of the Collinsville avenue building, in the blank left for the name of the grantee in the deed of Forrest of December 6, 1920, and Hale executed a deed on January 14, 1925, to Emily M. Fekete, trustee, and these deeds were filed for record on January 15, 1925. On January 16, 1925, Forrest executed a declaration of trust, stating that he held the property in trust for the children of his mother, Charlotte J. Fekete, being the defendants to the original bill, including himself. A. W. Baltz, vice-president of the bank, who had the negotiation of the loan in charge, having got some information from Forrest in regard to the title, told the appellee that he wanted an opinion of the bank's attorney before proceeding in the matter, and went with the appellee to the attorney's office and got an opinion concerning the filling in of the blank in the deed to Hale. Baltz knew there had been a deed from Forrest, as trustee, to Hale, and another deed from Hale to Emily M. Fekete, trustee,

but he had never heard of the declaration of trust. The appellee had told him that he could make a valid note and mortgage, but Baltz told him he would like to have it submitted to his attorney. When the attorney for the bank told the appellee that the deed to Hale did not pass the title to the property the appellee pulled out of his pocket the declaration of trust which constitutes the subject matter of this suit.

This declaration of trust is a typewritten document, dated December 4, 1920, the date of the conveyance from Charlotte J. Fekete and her husband to Forrest F. Fekete, trustee, which recites that conveyance and declares that the premises were conveyed to the grantee and he now holds and will continue to hold the same in trust for the use of Thomas L. Fekete and his heirs, and that he has no beneficial interest therein except what may arise by being one of the heirs of Thomas L. Fekete upon his death, and he covenants and agrees to convey the premises to Thomas L. Fekete or his assigns or heirs, as he or they may direct or require, whenever or as soon as he or they shall so desire. He further admits and agrees that Thomas L. Fekete shall have full power and authority to collect the rents, issues and profits of the premises and apply them as he shall see fit. This instrument purports to be signed by Forrest F. Fekete and to be sealed and delivered in the presence of Amanda K. Young and Thomas L. Fekete, Jr. The latter is a son of the appellee, an attorney at law, who has occupied for ten years a suite of offices in the Collinsville avenue building, consisting of four rooms. In addition to practicing law he has been engaged in the real estate, insurance and loan business in these offices. He has employed since January 1, 1916, Amanda K. Young, who has been his stenographer and has looked after the insurance business. The partition between the two front rooms of the suite had been removed and the first of these rooms was occupied by Miss Young, who had her desk in the front

part of the room. The appellee had a desk in the second room, which he occupied for his office, and the third was Thomas L. Fekete, Jr.'s private office. Miss Young occasionally did work for the appellee but was not employed by him. In the year 1920 Thomas L. Fekete, Jr., had in his office an Oliver typewriter, which he acquired in 1916 and continued to use until 1922. He used that typewriter exclusively. Miss Young had another Oliver typewriter which she used exclusively.

In regard to the execution of the declaration of trust the appellee testified that about the time of its execution his wife was in poor health, affected with heart trouble, and on December 4, 1920, she with him executed a deed to their son Forrest as trustee, with a trust agreement signed by him on the same date and at the same time; that the deed and declaration of trust were both prepared at the same time and before either of them was executed; that Thomas L. Fekete, Jr., did the actual typewriting of both; that they were signed and acknowledged at the same time, and the appellee saw Forrest himself sign the signature at the bottom of the declaration of trust, and his wife, Thomas L. Fekete, Jr., and Miss Young were all present and saw him sign it; that Miss Young signed as a witness in the presence of the appellee, his wife, and Thomas L. Fekete, Jr., and Thomas L. Fekete, Jr., signed his name just after hers, in the presence of Miss Young, the appellee, his wife and Forrest, and the three signatures were all placed there in the appellee's presence, in the office in the building on Collinsville avenue, at the same time as the deed was executed. The appellee further testified that his wife was present at the time when the declaration of trust was signed and when it was witnessed, and acknowledged the deed before Miss Young as notary public, who signed the certificate of acknowledgment; that Thomas L. Fekete, Jr., used the same typewriter in writing both documents, and it was his own typewriter.

Thomas L. Fekete, Jr., testified that he did not write the deed on the typewriter. He knew of its being made, but he was not present when it was written and did not dictate it. He did not know of his own knowledge by whom the deed was written, he was not present when it was signed and did not see it signed by either his father or mother; that he did not write the declaration of trust on the typewriter; that he did not sign his name to it but it looked very much like his signature, and were he to see it on something else, in all probability he would have to acknowledge it was his signature, but on this document he knew it was not his signature because he did not sign it. The first time he saw it was in the directors' room in the First National Bank of East St. Louis, in January, 1925. He did not know of its existence before that time. He first learned of it in a talk with the appellee's counsel about January 15 or 20, 1925. It was after the recording of the deed to Hale and the recording of the declaration of trust that he first learned of the existence of the declaration of trust. He did not see Forrest sign or affix his name to the declaration and did not see Miss Young subscribe her name as a witness.

Miss Young testified that she had been employed continuously since January, 1916, by Thomas L. Fekete, Jr., as his stenographer, and knew the appellee and Forrest F. Fekete in his lifetime and was acquainted with Forrest's signature. The first time she ever saw the declaration of trust was in January, 1925, in the directors' room of the First National Bank of East St. Louis; that the signature on that document is not her signature, she did not sign it and did not see Forrest F. Fekete sign it and did not see Thomas L. Fekete, Jr., sign it. She did not write that document on the typewriter. She wrote the deed from Charlotte J. Fekete and her husband to Forrest, as trustee, on her typewriter, and also the deed from Forrest to Charles O. Hale, with the exception of the name of the

grantee and the words "actual consideration." When she completed that document there was no name of a grantee in it, and the words "actual consideration" were not there. They have been added since and she did not add them. Mrs. Fekete did not come to the office and sign the deed. Miss Young supposed she signed it at her residence. She did see the appellee sign it. She has no recollection of Thomas L. Fekete, Jr., being present. She did not see Mrs. Fekete sign the deed, but she knew her signature and took the acknowledgment because of that fact. Mrs. Fekete did not appear before her. She called Miss Young on the telephone the day the deed was made and told Miss Young it was her signature and Miss Young took the acknowledgment over the telephone. The appellee asked her to typewrite Mrs. Fekete's deed to Forrest, and Forrest's deed, without a grantee, and she did it at his request. Forrest appeared and signed and acknowledged the deed which she wrote without the name of the grantee in it, all at the appellee's request. It was delivered to the appellee after it was signed and acknowledged, because he was to keep it in case something happened to Forrest.

The appellee contends in support of the decree that the appellants cannot deny the execution of the declaration of trust because its execution was not denied under oath in their pleadings, relying upon section 52 of the Practice act. They cite the case of *Dean* v. *Ford,* 180 Ill. 309, in support of the proposition that this section applies to chancery suits. The statement in that case that proof of the execution of the notes involved in a foreclosure suit is not requisite in the absence of a sworn answer denying the execution was incorrect, and is inconsistent with the decisions of the court, both before and since, that no part of the Practice act has any reference to the mode of procedure in chancery cases except in so far as the language expressly or by clear implication refers to such procedure. The practice in chancery is regulated by the Chancery act, except so far as is other-

wise expressly enacted or necessarily implied by subsequent legislation. *Moore* v. *Tierney,* 100 Ill. 207; *Railway Conductors' Benefit Ass'n* v. *Robinson,* 147 id. 138; *Brinkman* v. *Bowles,* 280 id. 27; *People* v. *Murphy,* 296 id. 532.

The appellee also argues that the appellants having charged him with the crime of forgery in their pleadings, the burden is upon them to prove this charge beyond a reasonable doubt. The foundation of the complainant's bill is the declaration of trust. Proof of its execution is essential to the maintenance of his cause of action. The burden of proof is therefore on the appellee and not on the appellants. Denial of the execution of a written instrument does not constitute a charge of forgery against the party relying upon the instrument. The rule which the appellee relies on applies only to cases where a charge of crime is made in the pleadings against a party to the suit. *Waggoner* v. *Clark,* 293 Ill. 256; *Foster* v. *Graf,* 287 id. 559; *Grimes* v. *Hilliary,* 150 id. 141.

The declaration of trust purports to be executed by Forrest F. Fekete and to be witnessed by Amanda K. Young and Thomas L. Fekete, Jr. The appellants contend that the evidence does not establish the genuineness of the signature of either one of these persons. The two witnesses deny the names appearing on the instrument are their signatures. Forrest died after answering the bill, before the hearing of the cause, and therefore his testimony does not appear in the record. A supplemental bill and a supplemental cross-bill were filed suggesting his death, leaving his father and his brothers and sisters, who were his codefendants, his only heirs, and praying the same relief against the surviving heirs as was prayed in the original bill and cross-bill. Thomas L. Fekete, Jr., though he testified that he did not sign the instrument, admitted that the signature of his name looked very much like his signature and that if he would see it on something else he would in all probability have to acknowledge it as his signature, but on

this document he knew he did not sign it and it was not his signature. It is not surprising, therefore, that a number of witnesses who were familiar with his signature testified that in their opinion the name signed was his genuine signature. Were the case to depend solely upon the weight of this opinion evidence in regard to the genuineness of this signature the decree would have to be affirmed. Were it dependent solely on the direct evidence as to the execution of the instrument it would have to be reversed.

That the simulation of handwriting may be carried to such a degree of perfection as almost to defy detection by the most expert judges was testified to on the trial and is evidenced by the contradictory testimony of experts in almost every trial involving a disputed document. The appellants did not try to meet opinion by opinion as to the signature of Thomas L. Fekete, Jr., but concede that the simulation is so complete that if the case stood on the evidence of the writing, alone, the genuineness of the signature must be considered as proved. They did not examine their expert witnesses on this question, but in answer to questions, on cross-examination, as to whether he did not have an opinion and what his opinion was, their witness Jay F. Wood answered that in his opinion the signature was not genuine because it was found upon a suspicious document, the other two signatures to which he was convinced were forgeries. When we turn to the direct evidence of the writing of the name we find the appellee, one of the three witnesses on the question, testifying positively to the writing of the name "Thomas L. Fekete, Jr.," by its owner, with particulars of time, place and circumstance, as has been already stated, while the other two testify directly to the contrary.

So far as the direct evidence of the execution of the declaration of trust is concerned, there is no preponderance in favor of the appellee. His interest extends to the whole property, while that of Thomas L. Fekete, Jr., is only one-sixth, and Miss Young has no pecuniary interest. There

is no reason whatever for her testifying falsely, though her interest in behalf of her employer is a proper matter for consideration as affecting the weight to be given her testimony. The transaction itself was unusual,—the execution of the deed to Forrest and two days later the execution of the deed with a blank for the grantee's name and the giving it to the appellee. It is not remarkable that Miss Young should remember it distinctly among the numerous occasions when she had witnessed the execution of documents or as a notary public had taken the acknowledgment of instruments. It is conceded that the deed from Mrs. Fekete to Forrest, his deed in blank as to the grantee, and the declaration of trust, were all written on the same typewriter, and if Miss Young's testimony is true that typewriter was the one she used. The appellee is not an operator of the typewriter, and if neither Miss Young nor Thomas L. Fekete, Jr., wrote the declaration of trust, it does not appear that there was any other person in the office who might have done so. The burden is not on the appellants, however, to show who wrote the document but is on the appellee to show its execution by Forrest. The questions of what typewriter the document was written on, who operated the machine, whether Mrs. Fekete signed the deed in the office or was present and acknowledged the deed, are not of themselves material to the rights of the parties, but the appellee's testimony about these circumstances attendant upon the event in controversy,—the execution of the instrument,—is given positively, and if he is mistaken about all these details this fact necessarily affects to some extent the degree of reliance to be placed upon his narrative. These three are the only witnesses having direct, positive knowledge of the fact in issue, and while the testimony of the witnesses who testify to opinions as to the genuineness of the signatures based upon knowledge or comparison must be considered, it is not to be taken as decisive, to the ignoring of the direct evidence.

So far as Miss Young is concerned, the direct evidence in regard to her connection with the instrument has been recited. Six witnesses from various banks in East St. Louis and Belleville, after comparison of Miss Young's name as it appeared on the declaration of trust with her signature "A. K. Young" as notary public to the certificate of acknowledgment of the deeds of Mrs. Fekete to Forrest and of Forrest to Charles O. Hale and of the declaration of trust of January 16, 1925, and with her signature "Amanda K. Young" to four checks which were introduced as standards of comparison by the appellants, gave their opinion that her name on the declaration of trust in question was not her signature. The appellee objected to the admission of these checks as standards of comparison because they were not submitted to his counsel before they were offered in evidence. The court stated that he would receive them subject to objection. No ruling was ever made on their competency, and it is now argued that the testimony based upon them should be excluded. The statute which authorizes the proof of handwriting by comparison provides that before a standard of writing shall be admitted in evidence for comparison such notice thereof shall be given to the opposite party or his attorney as under all the circumstances of the case is reasonable, and a reasonable opportunity shall, on motion duly made, be accorded to the opposite party, his attorney and witnesses, to examine such proposed standard. (Laws of 1915, p. 440.) The objection to the four checks should have been sustained and the evidence based on them should not have been admitted. However, the competent evidence in the record without regard to these checks, in view of all the other evidence in the case, requires a finding that the disputed signature of Miss Young is not her genuine signature.

Four witnesses called by the appellee testified as to the signature of Forrest F. Fekete: W. K. Cannady and A. W. Baltz, vice-presidents of the First National Bank of East

St. Louis, G. A. Miller, president of the Union Trust Company, and James M. Gucker, who was a fraternal secretary connected with the Masonic fraternity and had been city comptroller of the city of East St. Louis and chief clerk and correspondence clerk in a railroad office. The first named and the last named of these witnesses identified the signature as that of Forrest from their acquaintance with the signature and its general appearance and characteristics, and the first named by comparison, also, with the admitted signatures which were in evidence. Baltz had seen Forrest sign his name on one occasion, only, at the time of the negotiation for the $2000 loan, when he signed the mortgage, the note and six interest notes, which were exhibits in the case, and he testified that after examining those signatures, from his experience in the banking business and comparing those signatures with the signature on the declaration of trust, he would say that all those signatures were written by the same person. Miller testified that he had seen Forrest's signature a number of times but had not seen one for about a year, probably, at the time he testified; that he would say that all the signatures "Forrest F. Fekete" on complainant's exhibits 5, 6, 7 and 8, which were the declaration of trust, the deed to Hale and the notes for the principal and interest of the $2000 loan and the mortgage securing them, were written by the same party, Forrest F. Fekete. On the other hand, H. H. Jost, John A. Harzy and Sam D. Barber, the vice-president, cashier and assistant cashier of the Southern Illinois National Bank, G. O. Burch, book-keeper of the National Stock Yards National Bank, and Arthur W. Bieser and Ernst Gass, testified that in their opinion, based upon a comparison of the admittedly genuine signatures with the disputed signature, the latter is not genuine. Josephine F. Daniels and George E. Fekete, sister and brother of Forrest, testified to their acquaintance with his signature, and that the signature

323–31

to the declaration of trust was not, in their opinion, his signature.

The testimony of experts whose business was more or less exclusively that of examiners of disputed documents was introduced, of one by the appellee and of two by the appellants. One of them testified in support of the appellee's claim of the genuineness of Forrest's signature to the declaration of trust and two against it. They testified in detail in regard to the various signatures of Forrest and of Miss Young which were in evidence, the characteristics or peculiarities of admitted signatures which appeared in those which were disputed, the points of resemblance and the points of difference between the disputed signatures on the one hand and those on the other hand which were admitted to be genuine, and the reasons which led J. M. Trendley, who was called by the appellee, to be of the opinion that the names signed to the declaration of trust were the genuine signatures of the persons whose signatures they purported to be, and which led Gus Mechin and Jay F. Wood to believe that they were not genuine signatures. This testimony includes a mass of minute detail too extensive to be set out in an opinion. There were introduced in connection with the testimony, photographs of the disputed signatures and of the admitted signatures which were used for purposes of comparison. These photographs, together with all the original exhibits introduced in evidence, have been certified to us with the record and we have had the benefit of them in the consideration of the case. In arriving at a conclusion by comparison we are in as good a position to arrive at a correct result as the chancellor, though so far as the testimony of witnesses is concerned he had the advantage of hearing them testify. Opinions as to the genuineness of handwriting are at best weak and unsatisfactory evidence. There is much room for error and great temptation to form opinions favorable to the party calling the witness. The value of such testimony varies

with the circumstances of each particular case. While opinion evidence based upon hypothesis has been held to be of but little value, the opinion of an expert may be of great value where it calls the attention of the court to facts which are capable of verification by the court which the court otherwise would probably have overlooked, and the opinion of the expert is based upon such facts and is in harmony therewith. *Lyon* v. *Oliver,* 316 Ill. 292.

While the question of the genuineness of each of the supposed signatures attached to the disputed document is of importance for its bearing on the question of the genuineness of the others, the question of final importance is the genuineness of the signature of Forrest F. Fekete. The determination of that question is the end to which all the evidence is directed. Eleven admittedly genuine signatures of the name "Forrest F. Fekete" were admitted in evidence and we have them before us. They were on the deed in blank in which the name of Charles O. Hale was subsequently inserted as grantee, the principal note and six interest notes for the $2000 loan, the mortgage securing them, the declaration of trust of January 16, 1925, and a signature card dated January 8, 1913, held by the Illinois State Trust Company Bank. The three capital "F's" (the initials of his name) are the conspicuous feature of his signature and they are written very uniformly, though there is a slight variation from the type in the early signature card, written eight years before the first of the other signatures. The stem of the letter "F," wherever it occurs in the ten signatures written in 1920 and 1925, is a straight line with a uniform slant to the right. The top of the letter is a curved line beginning in front of the stem near the top, forming an oval loop half the length of the stem or more, returning and crossing above the top of the stem with a double or a single curve. The letter was completed by a straight line crossing the stem about in the middle, with an upward slant, and then turning down at an acute angle, with a slant paral-

lel to the stem. The "T" in trustee, where that word occurred, was made in the same way, omitting the cross-bar on the stem. Each of the admitted signatures has three "F's" of this character. The striking difference of the disputed from the admitted signatures is that none of the three "F's" are of the same pattern as that of the admitted signatures or a similar pattern. The first, instead of beginning at the top of the stem with a straight, slanting, downward stroke, begins near the top with a slanting, upward stroke, then, starting back at a sharp angle, sweeps downward with a symmetrical double curve to the bottom, where the curve continues up, ending in an oval loop. The top of the letter is a curve beginning near the top, near where the pen started the upward stroke at the beginning of the letter, forming the oval and returning in a curve above the stem. The "F" in the last name is made in substantially the same way, though the curve at the bottom of the stem is irregular. The middle "F" is a symmetrical double curve, which does not start with a preliminary stroke of the pen as do the other two and does not extend into a loop at the bottom. This signature is certainly not the usual signature of Forrest F. Fekete. The difference is apparent at a glance. In the early signature of January 8, 1913, the stems of the second and third "F's" are not entirely straight but each is slightly curved. They have a slight resemblance to the middle "F" in the disputed signature, but their slight curvature has only a very remote resemblance to the rather ornate flourishes of the other two.

The appellee, for the purpose of showing that Forrest did not have any uniform method of making the capital "F's" in his name, introduced in evidence the indorsement of Forrest on seven checks in which he wrote his name "F. F. Fekete." The "F's" in those indorsements were entirely different from those in either the disputed or the admitted signatures. Each of the signatures was made with one continuous movement of the pen, without lifting it

from the paper. The stems of the "F's" consist of long oval loops and begin with an upward stroke, returning downward curving to the left, then upward, crossing the down stroke, forming the oval and continuing to the top of the next letter, then repeating the same movements twice, and after the second repetition continuing with the remaining letters of the name. The top of the three "F's" is formed by continuing the final stroke of the last "e" upward and then backward to make the crossing of the "t" and then further back to the beginning of the signature, where an oval or circular loop is formed, and a long, curved flourish above the top of the signature forms the upper part of the capital "F's." This signature is manifestly a formal signature purposely adopted, different from his ordinary signature, and does not control in determining the genuineness of the disputed signature.

We recognize the rule that where a cause has been heard in open court and the chancellor has heard the witnesses his decree will not be reversed unless manifestly against the weight of the evidence, but after a careful examination of the exhibits and consideration of the evidence we are satisfied that the appellee did not sustain the burden of proving that Forrest F. Fekete executed the declaration of trust but that the preponderance of the evidence was that he did not.

The decree will be reversed and the cause remanded, with directions to dismiss the original bill for want of equity, to enter a decree on the cross-bill canceling the declaration of trust as a cloud on the title of the appellants and providing for an accounting by the receiver.

*Reversed and remanded, with directions.*