First Galesburg National Bank and Trust Company, Appellee, v. Federal Reserve Bank of Chicago et al. Federal Reserve Bank of Chicago, Appellant.

Gen. No. 9,259.

Opinion filed May 10, 1938. Rehearing denied June 14, 1938.

CHARLES E. LAUDER and FREDERICK H. LAUDER, both of Monmouth, for appellant; CHARLES B. DUNN, of Chicago, of counsel.

EUGENE D. HARDY, of Galesburg, for certain appellee.

WOOLSEY, STICKNEY & LUCAS, of Galesburg, for certain other appellee.

MR. PRESIDING JUSTICE DOVE delivered the opinion of the court.

First Galesburg National Bank and Trust Company filed its complaint in the circuit court of Knox county, Illinois, against the Federal Reserve Bank of Chicago, William English as county treasurer of Knox county and Margaret E. McGann. The complaint alleged that on September 22, 1934, the county treasurer of Knox county drew his check upon the plaintiff bank, payable to Margaret E. McGann for $702.51, that subsequently, and on September 27, 1934, said check indorsed "Margaret E. McGann by Charles H. Morgan Assignee, Charles H. Morgan" was presented to the plaintiff by the Federal Reserve Bank of Chicago for payment,

the said Federal Reserve Bank specifically guaranteed said indorsement and guaranteed that the person indorsing the name of Margaret E. McGann was duly authorized to do so and that relying upon said indorsement the plaintiff paid the amount of said check to said Federal Reserve Bank. The complaint then alleged that Charles H. Morgan was not the legal holder of said check or authorized to indorse the payee's name thereon and that said Federal Reserve Bank had no title to said check when it presented said check to the plaintiff for payment. The complaint further alleged that when the check was presented to it for payment by the Federal Reserve Bank it charged the check to the county treasurer's account but that thereafter it learned of the unauthorized indorsement thereon and thereupon credited the amount back to said account of said treasurer. Judgment against the Federal Reserve Bank for the sum of $702.51 was demanded or in the alternative if the said indorsement was found to be genuine or duly authorized that then judgment be rendered against William English, the county treasurer, for said sum.

The several defendants filed their answers and counterclaims. The answer and counterclaim of the Federal Reserve Bank admitted the issuance, presentation and payment of the check as alleged in the complaint but denied that Charles H. Morgan was not the legal holder and owner thereof and denied that Morgan was not authorized to indorse Margaret E. McGann's name thereto. After the issues had been made up, the cause was submitted to the court for determination, resulting in a judgment in favor of the plaintiff and against the Federal Reserve Bank of Chicago for $702.51, from which said Reserve Bank appeals.

The evidence discloses that in 1916, Margaret E. McGann was entitled to a distributive share in the proceeds of the sale of certain real estate, sold by the master in chancery pursuant to the terms of a decree

in a partition proceeding then pending in the circuit court of Knox county. The records of this partition proceeding disclosed that the address of Margaret E. McGann was unknown and she was served by publication notice only. Her distributive share amounted to $702.51 and this amount was paid by the master to the county treasurer to be held by him for the said Margaret E. McGann. In 1934, Charles H. Morgan, a resident of Newton, Iowa, and who was then engaged in looking up and collecting money belonging to or due lost or unknown heirs, discovered on the records of Knox county that Margaret E. McGann was entitled to this $702.51, then in the hands of the county treasurer.

The evidence further discloses that Margaret E. McGann at the time of the hearing was 60 years of age, that prior to 1901 she lived in Galesburg, but left there when she was 24 years of age, joined the Order of the Sisters of Mercy under the name of Sister Mary Clare and in 1934 was located at St. Catherine's, a convent at Oak Park, Illinois. Morgan went to interview her there and in that interview advised her that she had some money due her and that he could collect this money for her if she would sign a contract permitting him to collect the money. At this meeting the only ones present were Mr. Morgan and Miss McGann and there is a sharp conflict in their evidence. Mr. Morgan testified that at the time of the hearing he was 36 years of age; that his business was to look up claims in various counties where money has been deposited for the benefit of lost heirs and to collect such money for such heirs upon a 50 per cent basis; that on the morning of August 2, 1934, he called at the convent in Oak Park and asked for Miss McGann; that he there had a conversation with her, advised her that she had some money coming to her but did not tell her where the money was coming from because if he did it was his experience that the party would proceed to collect

it and he would receive no compensation for locating it. Upon this occasion, Morgan testified that he prepared two identical contracts, that Miss McGann signed both of them, retained one and delivered to him the other. Upon the hearing he produced the contract which she handed to him after she had signed it and it is as follows, viz:

"Amount $——— Case No. 5643

### Contract of Employment

"This Agreement made and entered into by and between Margaret E. McGann also known as Sister Mary Clare of Oak Park, Ill., hereinafter called first party, and Charles H. Morgan, of Newton, Iowa, hereinafter called second party, witnesseth:

"That, whereas, the second party is engaged in the business of ferreting out and collecting unpaid claims arising in the several States and while engaged in such business has discovered a claim due the first party. The second party states that said claim is coming from a county and he shall have no right to collect from anyone other than a County.

"It is therefore mutually agreed between the parties hereto:

"That in consideration of the efforts of the second party hereinbefore and hereinafter made and in finding said claim,* the first party does hereby employ the second party to take whatever steps are necessary to collect said claim, instituting suit if necessary, it being agreed and understood that the first party is to be in no way liable for any of the expenses incident to the discovery and collection of said claim; the first party is to pay unto the second party a sum equal to an undivided one-half of the net proceeds of said claim, in full of all services rendered, upon the completed settlement of the same.

---

* At this place in the printed portion of this contract are these words, "and revealing the same to first party." These words are stricken out with a pen.

"For the purpose of aiding and assisting the second party in the collection of the said claim the first party does hereby sell, assign, transfer and set over unto the second party the said claim and does hereby authorize, empower, request and direct the County Treasurer and County Auditor to pay the said amount unto the second party.

"Dated at Oak Park Ill this 2nd day of August A. D. 1934, by the said both parties and at Newton, Iowa, this —— day of —— A. D. 193—, by the said Charles H. Morgan.

MARGARET E. McGANN (SR. M. CLARE.)

First Party

CHARLES H. MORGAN"

Margaret E. McGann testified that she was a member of the Sisters of Mercy and had been for 36 years, that she did not sign the foregoing contract and upon direct examination said she never saw it until it was presented to her while she was upon the witness stand and testifying in this case, that she met Morgan on August 2, 1934, at St. Catherine's Convent at Oak Park but signed nothing at that time and never saw Morgan again until the day she testified upon the hearing. That upon the occasion when Morgan came to the convent on August 2, 1934, he, Morgan, told her he was a member of the American Legion, that as such he had privileges others did not have and that she was entitled to receive some money from a county but he did not name the county. That she told him that there was only one piece of property in which she might be interested and that was in Knox county, that if it was in any other county she was the wrong party, and that she was not interested in taking anything away from her relatives. That she further told Morgan that there could be no money belonging to her that did not accrue from her father's or mother's earnings, that she was an heir to a share in her mother's property but she had disposed of her rights in that by giving her brother

a quitclaim deed before she entered the convent in 1901. That when Morgan stated to her that the money to which she was entitled was from a county, she told him that no county was making a donation to her and if there was any money it must have come from relatives or from the sale of her parents' property. Upon cross-examination she testified that Morgan did have a contract with him, that the paper he had was much smaller and of a different color than the contract produced upon the hearing, that she read the instrument Morgan handed to her to the place where it stated "revealing the same to first party," that she then handed it back to him, stating that he had not revealed to her the amount of money or where it was, that he made ·no alterations in it in her presence or at her request and she never took the contract back in her hands afterward.

Margaret E. McGann further testified that prior to entering the convent in 1901 she taught school in Knox county for six or seven years and since that time has been teaching continuously in the convent. That she teaches music, English, spelling, reading, writing and other subjects, that she understands terms used to describe forms of writing and in her testimony referred to the Spencerian and Palmer systems and stated that she never used other than a Spencerian "M" in writing her name and never made the Palmer "M's" which appear in her signature upon the questioned document. She was cross-examined at considerable length with reference to her signature which appeared upon this questioned instrument and her admittedly genuine signatures appearing upon instruments used as standards for comparison. She further testified that prior to August 1934, except upon one occasion she had not written her name as Margaret McGann for 36 years but during all this period of time used her ecclesiastical name of Sister Mary Clare.

The evidence further discloses that on August 6, 1934, Morgan wrote Miss McGann at Oak Park, Illinois, from Newton, Iowa, addressing her as Sister Mary Clare, as follows: "I am enclosing herewith a paper giving me authority to collect any monies from a County Treasurer for you. It is necessary that I have such an item signed in order to properly handle the matter. Will you please sign the same and arrange to have a Notary Public take the acknowledgment of your signature? Please advise me of the charge for such acknowledgment and I will remit the same to you at once. . . . I enclose herewith a stamped and addressed envelope for your convenience in returning the enclosed authority." The instrument inclosed in this letter is as follows: "I, Margaret E. McGann, residing at 25 West Washington Boulevard in Oak Park, Illinois, do hereby authorize and direct the County Treasury of said County to issue a check for all monies in his hands belonging to me, and deliver the same to Charles H. Morgan of Newton, Iowa, and to take his receipt of said check. Dated at Oak Park, Illinois, this —— day of August, A. D. 1934. —— STATE OF ILLINOIS, COUNTY OF COOK, ss. I, ——, do hereby certify that I am a Notary Public in and for Cook County, Illinois; that Margaret E. McGann, personally known to me to be the same person whose signature is affixed to the foregoing instrument, appeared before me this day in person and acknowledged that she signed, sealed, and delivered said instrument as her free and voluntary Act for the uses and purposes therein set forth. Given under my hand and Notarial Seal this —— day of August, A. D. 1934. —— Notary Public."

No reply was made to this letter and Morgan again wrote Miss McGann on August 28, 1934, to the effect that he had not received the papers previously sent her and advising her that if it was not convenient for her to have the instrument acknowledged before a

notary public that it would be sufficient to have it witnessed by two or three witnesses and requested that it be returned as soon as possible. Morgan concluded this letter by stating: "I have already started action on this matter for you and will have some definite news by the middle of September." On September 5, 1934, Miss McGann wrote Morgan as follows: "Your letter of August 28th, has just reached me. I didn't give you any authority to start proceedings with regard to the matter in Chancery. I would say only what I said in the beginning—that if it took anything in any way from my brother, I could not become interested. He has explained to me how it happened. The attorney who drew up the quit-claim deed years ago will be able to adjust the matter in a satisfactory manner. Thanking you for your interest and trusting this will close the matter, I am Respectfully Yours, Margaret E. McGann." On September 15, 1934, Morgan answered this letter stating that he was at a loss to understand her attitude, that he had been proceeding under their written agreement, had gone to considerable expense, that he would not consent to any cancellation of the agreement and that he was proceeding to complete the collection at once.

The evidence is further that on September 22, 1934, Morgan filed in the circuit court of Knox county his verified petition to redocket the partition proceedings and for an order upon the county treasurer to pay the distributive share due Margaret E. McGann. Upon this petition, a hearing was had and on the same day an order was entered authorizing the county treasurer to draw a check to Margaret E. McGann for $702.51 and deliver the same to Morgan. Upon the entry of this order the county treasurer drew a check for $702.51, payable to the order of Margaret E. McGann and delivered it to Morgan, who indorsed it "Margaret E. McGann by Charles H. Morgan assignee" and de-

posited it on September 25, 1934, in the Jasper County Savings Bank at Newton, Iowa, which bank transmitted it in due course to the Federal Reserve Bank in Chicago, which indorsed and guaranteed all prior indorsements and sent it to the bank upon which it was drawn. As stated, the First Galesburg National Bank and Trust Company accepted the check and charged it to the account of the county treasurer and returned it as a paid and canceled check to the county treasurer on or about September 30, 1934. On October 2, 1934, Morgan sent to Miss McGann a check for $351.26, being one-half of the amount he received from the county treasurer. On October 4, 1934, Miss McGann returned this check to Morgan by registered mail and wrote him stating that she had received the check that day, that she had not entered into any contract with him, had not signed any papers for him or authorized him to collect any money for her and demanded a check for the full amount of $702.51. Morgan again sent the check to her but she again returned it, reiterating what she had written in her previous letter and stating definitely that she would not accept this check or any other unless it be for the full amount he had received from the county treasurer of Knox county.

Upon the hearing several admittedly genuine signatures of Margaret E. McGann were introduced in evidence and Katherine Keeler, a handwriting expert of the Northwestern Crime Detection Laboratory of Northwestern University testified with the aid of photographic enlargements and in her opinion the same person affixed the signature to the disputed contract as signed the documents used as standards for comparison. John H. Cox, the principal of Brown's Business College in Galesburg and a teacher of handwriting with 35 years of experience was of a contrary opinion and both witnesses gave their reasons for their respective opinions. Catherine Lynn, a niece of Mar-

garet E. McGann, testified that she was familiar with the handwriting of Margaret E. McGann, had seen her write her name, Mary Clare, prior to August 2, 1934, and had since that time seen her write her name Margaret E. McGann, and in her opinion the signature appearing upon the questioned document was not the genuine signature of Miss McGann. The trial court found that the instrument in question was not signed by Miss McGann and in disposing of the case the trial court, among other things, called attention to the fact that in the signatures used as standards for comparison, there appeared twenty capital "M's" and that in the questioned signature there are three and that there is no similarity between the twenty and the three and called attention to the evidence of Mrs. Keeler. In her testimony Mrs. Keeler stated that nowhere in the disputed signature did she find any evidence of forgery in the light of quality or of discrepancies in the form of letters except discrepancies in the form of the capital letters. In her cross-examination she admitted that not one of the capital "M's" in the admittedly genuine signatures was like the capital "M" in the signature appearing on the disputed document. In order to account for this difference she was of the opinion that a forger who was undertaking to forge a name would not undertake to make such a marked difference but would endeavor and could very readily simulate a capital "M" which would bear a much more striking resemblance to the genuine than any of the capital "M's" appearing in the signature upon the questioned document. The trial court also called attention to the fact that in the standards used for comparison, the name "Margaret" was written eight times and it appears that each time the pen was lifted from the paper and a new stroke was made to start the letter "a" while in the questioned signature the writer made the letter "M" and continues it into the letter

"a." Furthermore, the letter "r" following the letter "a" in Margaret in all the genuine signatures is not similar in any respect to the "r" appearing in the questioned signature. In the admittedly genuine signatures of the name "Margaret" each of the lower case letters, preceding the last letter "t" appear to be attached to the previous letter and touch the base line while in the questioned signature such is not the case and four out of the seven do not touch the base line. Many other discrepancies appear which were pointed out by the several witnesses and which were referred to by the trial court when he disposed of the case.

According to the testimony of Morgan, Miss McGann signed the contract heretofore set forth in this opinion on August 2, 1934, yet on the fourth day thereafter he wrote her stating that he was sending with his letter a paper giving him authority to collect any moneys due her from a county treasurer and that it was necessary for him to have such authority in order to handle the matter and requested her to sign the instrument which he inclosed and which, by its terms, directed a county treasurer to issue a check for all moneys belonging to her and to deliver the same to Morgan. Just why Morgan would write this letter if Miss McGann had executed the contract which appellant relies upon in this case is not explained. If Miss McGann had executed the contract on August 2, 1934 and Morgan had it, certainly there was no occasion for him to request her on August 6th and again on August 28th to execute another contract. In neither of the letters of August 6th or August 28th is any reference made by him to the contract which he now claims she executed on August 2, 1934.

This record presents a question of fact. Mr. Morgan testifies that he was present and saw Miss McGann sign the contract upon which appellant relies. Miss McGann testified that her signature thereto is not her

genuine signature. In the opinion of Mr. Cox and Catherine Lynn, the disputed signature is not that of Miss McGann. In the opinion of Mrs. Keeler it is. In *Fekete v. Fekete*, 323 Ill. 468 the court said (pages 482, 483) : ''Opinions as to the genuineness of handwriting are at best weak and unsatisfactory evidence. There is much room for error and great temptation to form opinions favorable to the party calling the witness. The value of such testimony varies with the circumstances of each particular case. While opinion evidence based upon hypothesis has been held to be of but little value, the opinion of an expert may be of great value where it calls the attention of the court to facts which are capable of verification by the court which the court otherwise would probably have overlooked, and the opinion of the expert is based upon such facts and is in harmony therewith.'' In the instant case the original contract to which appears the questioned signature together with the original instruments bearing the admittedly genuine signature of Miss McGann and used for purposes of comparison are found in the record and we have examined them in connection with the testimony and the photographs of the admitted and disputed signatures also found in the record. The trial court heard and saw the witnesses. The conclusion of the trial court in our opinion is supported by the evidence found in this record and there is no error in the record which would warrant us in reversing this judgment.

During the course of the hearing in the circuit court, counsel for appellant during the cross-examination of Miss McGann asked her if she would care to write her name for the purpose of comparing her signature with her signature as it appeared upon the disputed contract. The court sustained an objection and the witness was not required to do so. It is insisted that this was error and counsel call our attention to *Rogers v.*

*Tyley,* 144 Ill. 652, 10 R. C. L. 999, 22 C. J. 784, 785, and several cases from other jurisdictions. The *Rogers* case, *supra,* was a proceeding under the ''Burnt Records Act'' to establish title to certain real estate in Cook county. Upon the hearing, a letter was introduced in evidence purporting to have been written by Thos. Rogers on behalf of Jason Rogers. Thos. Rogers was called as a witness and testified that to the best of his knowledge he did not write the letter. Upon cross-examination the witness was asked to reproduce the letter in his handwriting by sentences and he did this and the court in its opinion commented upon the fact that there were many features of resemblance between the handwriting in the letter and the reproduction of it by the witness when he testified. There was no objection made to the procedure that was followed in the *Rogers* case and no discussion of this matter of trial practice by the court. In 10 R. C. L. 998, 999, sec. 184 of the article on Evidence, the author says: ''Generally speaking, the fact that an offered standard has been made since the controversy affecting the disputed signature arose, does not render it incompetent, if there is likelihood that it was not manufactured for the occasion of the trial; and it is obvious that this objection can apply only in a case where the specimen is offered by the party whose handwriting it purports to be. But the general rule undoubtedly is that a signature made for the occasion and post litem motam may not be used for comparison. And so, ordinarily, a party to an action is not entitled to write his signature in the presence of the jury for the purpose of being compared with a signature purporting to be his, the genuineness of which he denies. Under some circumstances, however, specimens may be made in court in the view of the court or jury expressly for the purpose of comparison. So there is excellent authority holding that a witness may be

called on in cross-examination to write in open court, in order that the jury may compare such writing with the controverted signature, the ground of decision being that this is merely a part of the cross-examination, and for the purpose of contradicting the witness.''

In 22 C. J. 784, 785, it is stated that a person whose handwriting is in question cannot be permitted to write something at the trial and offer the specimen so prepared as a standard; that the court will not, as a rule, order the person whose writing is in question to write in court at the suggestion of counsel, but it has power to make such an order and when it does, the standard so obtained may be used; that the better view appears to be that where a witness has denied what purports to be his handwriting, he may on cross-examination be called upon to write in order that such writing may be compared with the disputed writing for the purpose of contradicting him as it is no objection that a standard of handwriting was written *post litem motam* where the standard is produced by the party adverse to the writer.

All of the cases from other jurisdictions cited by counsel for appellant are criminal cases and many of them are discussed following the report of the case of *Rex v. Voisin,* 1 K. B. 531, as reported in 1 A. L. R. 1298, in an annotation having to do with the admissibility in evidence for the purpose of comparison of a writing made by an accused person at the request of public authorities. Among the cases referred to in this annotation is *Bradford v. People,* 22 Col. 157, 43 Pac. 1013, where it was held that when an accused denies under oath that he wrote a document, the court may require him to write, in the presence of the jury, in order that the jury may compare such writing with the controverted writing. The court in the *Bradford* case stated that the law in reference to the admission of writings for the purpose of comparison is the same in

criminal cases as in civil cases and cited *Wilbur v. Eicholtz,* 5 Col. 240. Another civil case referred to in this annotation is *Bronner v. Loomis,* 14 Hun (N. Y.) 341, where it was said that a party asserting a forgery cannot, upon the trial, make his own signature, and then offer the signature so made in evidence, for the purpose of comparison with the controverted signature for obvious reasons but, concluded the court, ''if the opposite party chooses to take the risk, we think, a signature thus made may be offered in evidence by the latter, for the purpose of comparing it with the signature in question. (Citing authorities.)''

The record in the instant case discloses that the trial occurred in the circuit court on April 22 and 23, 1937, that the disputed contract purported to have been executed on August 2, 1934, that eight admittedly genuine signatures of Miss McGann were offered by appellant and admitted in evidence without objection, six of these were made by her in October, 1934, and one in May and one in September, 1936. We are of the opinion that it would have been perfectly proper for the trial court to have required Miss McGann at the request of counsel for appellant to write her name. Miss McGann had denied, upon direct examination, that the signature on the contract was her genuine signature. Of course it would not have been competent for her upon her own motion or that of her counsel, to write her name in the presence of the court for the purpose of comparing the signature that she would write with the one appearing upon the disputed document but as counsel for appellant called for it, we think it would have been entirely proper to permit or require her to write her name as witnesses are frequently called upon to do some physical act supporting or contradicting their direct testimony, and as such it was legitimate cross-examination. *King v. Donahue,* 110 Mass. 155, 14 Am. Rep. 589; *Commonwealth v.*

*Allen,* 128 -Mass. 46, 35 Am. Rep. 356; *People v. DeKroft,* 49 Hun 71, 1 N. Y. Supp. 692; *Smith v. King,* 62 Conn. 515, 26 Atl. 1059. The refusal however of the trial court to require her to write her name was not, in our opinion, reversible error under all the facts and circumstances disclosed by this record. If the objection had been overruled and she had written her name as counsel desired, there would simply have been another admittedly genuine signature of Miss McGann in the record. There were eight already. More than two years had elapsed between the time when the disputed contract was alleged to have been executed and the trial. The circumstances and surroundings which existed on August 2, 1934, at which time the signature of Miss McGann is alleged to have been affixed to the disputed contract were entirely different than they were at the time she was requested to write her name in open court and whether she should have been required by the court to write her name is a matter which we believe under the authorities is committed to the trial court to be asserted or withheld, as stated by some of the authorities, as the circumstances may seem to warrant.

It is also insisted that the trial court erred in permitting John H. Cox to express an opinion as to whether or not the person who wrote the name of Miss McGann on the questioned document was the same person who wrote her name upon the admittedly genuine standards. The objection is that he was not qualified to testify as an expert. Mr. Cox testified that he was a graduate from a normal school and of Blackstone Institute in Chicago, having obtained therefrom a law degree, that he was principal of Brown's Business College in Galesburg and had been for 35 years, that during all those years he regularly taught handwriting and was so engaged at the time he testified, that he had done some work in deciphering handwriting in order

to determine whether it was genuine or not, that he occasionally read an article upon the subject and upon the question of whether a person's handwriting was genuine or not he had testified several times in the circuit court of Knox county. We have read his testimony, both upon direct and cross-examination from the record, which covers 22 pages of the record. He pointed out at considerable length and with clearness and cogency the reasons for his expressed opinion. His evidence disclosed that he was qualified by study, experience and skill to examine the signature appearing upon the questioned contract and compare that signature with those appearing upon the standards in evidence.

There is no test by which it can be determined with mathematical certainty how much experience or knowledge of handwriting a witness must have in order to qualify as an expert for comparison. In *Heffernan v. O'Neill,* 1 Neb. (Unof.) 363, 96 N. W. 244, it was held that a witness who had been a student of penmanship for about 30 years, had given special study to the comparison of signatures and had been frequently called upon to compare signatures for the purpose of determining whether they were genuine or not, had attended a business college and taught penmanship during these years and was familiar with the different systems of penmanship was qualified to express an opinion as an expert. In *Moody v. Rowell,* 17 Pick. (Mass.) 490, 28 Am. Dec. 317, it was held that a writing master professing skill in detecting forgery was competent to express an opinion from comparison as to the genuineness of a signature. In order that a witness be competent as an expert in respect to handwriting, it is not necessary that he should belong to any particular calling or profession, it is only necessary that the business opportunities and intelligence of the witness should be such as to enable him to have reasonable skill in judg-

ing of handwriting. 3 Jones Commentaries on the Law of Evidence, 648, 649.

There is no merit in appellant's final contention that it was error to permit Catherine Lynn to testify that in her opinion the signature of Miss McGann appearing upon the questioned contract was not her genuine signature. It appeared from the evidence that Miss Lynn was 32 years of age, that she was a niece of Miss McGann, that she had lived in the school with her for many years but had not been in any of her classes, that Miss McGann had coached her in her school work at least one evening a week for many years, that prior to 1934 she had seen Miss McGann write her ecclesiastical name, Mary Clare, and that since then she had seen her write her secular name and her name to each of the several exhibits used as standards for comparison. Being therefore acquainted with the signature of Miss McGann and having seen her write, she was competent to express her opinion as to the genuineness of the signature appearing upon the questioned contract. *Riggs v. Powell,* 142 Ill. 453; 3 Jones on Evidence, 596, 597.

In the instant case the trial court was in a position to observe the witnesses as they testified. The record shows that the trial court did carefully consider all their testimony with due regard to their character and their ability to know the things concerning which they testified. The judgment of the trial court is supported by the evidence and there is no reversible error in the record. The judgment will therefore be affirmed.

*Judgment affirmed.*