THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CLEADUS STAPELTON, Defendant-Appellant.

(No. 71-16;

Third District—March 27, 1972.

478

John O. Vogel, of Glen Ellyn, for appellant.

Louis R. Bertani, State's Attorney, of Joliet, (Joseph C. Polito, Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE SCOTT delivered the opinion of the court:

This is an appeal from the Circuit Court of Will County, Illinois.

The defendant was found guilty after trial by jury of the crime of armed robbery and sentenced to a term of not less than seven nor more than twenty years in the penitentiary. This conviction and sentence resulted from an occurrence on the evening of June 16, 1969, at which time the defendant allegedly committed an armed robbery of a gasoline service station in Joliet, Illinois. At the time of the alleged crime Dana Tucker, age 16, and another young man, Mark Hines, were attendants at the service station. The record discloses that the defendant was at the station from one and one-half to two hours immediately prior to the alleged crime. During this period the defendant borrowed a pencil and pad of paper and wrote something upon the pad. Apparently dissatisfied with what he had written, he threw a sheet of paper into the wastebasket and again wrote something upon the pad. Eventually the attendant Hines left the station to get a pizza at a place of business some two or three blocks away from the service station, but before he departed he gave the key to the cash register to his fellow employee, Tucker.

The testimony of the witness Tucker is that during Hines' absence the defendant asked that he be given change for a nickel and upon the cash register drawer being opened the defendant told him he might as well leave the drawer open and he was then given a note which stated:

"This is a stick up just be quiet and open up your cash register and hand me all your money. then just go into the mens room and stay there. do this and you won't get hurt. I have a gun under my shirt and if I have to draw it I'll use it.

This money will be paid back.

I need it in a"

Tucker further testified that he thought the defendant was joking and asked him if he had a gun, to which the defendant answered yes, pulling back his shirt which displayed that the defendant did in fact have such a weapon. The testimony of Tucker is that the defendant first asked for $70.00, then increased his demand to $80.00, which was then given to him. Tucker testified that he was then ordered to go into the washroom but prior to obeying this demand he asked defendant for the note because he did not believe his boss would believe his story of the holdup unless he could produce the note. The defendant honored this request and gave the note to Tucker. On cross examination Tucker testified that he did not know what happened to the piece of paper the defendant threw into the wastebasket.

The record discloses that the defendant admitted he had been in the service station and had written a note, but it is the defendant's contention that the note was to be delivered to his brother and that it merely informed his brother that he, the defendant, was going to attend a movie. Defendant further testified that there might have been a prior note which he discarded because it contained some discrepancies. He denied that he had a gun or that he committed the alleged crime. While in jail the defendant wrote to the State's Attorney and this letter was used for purposes of handwriting comparison during the course of his trial. During the trial the defendant was asked to examine the alleged "stick up" note and testified that the same "looks like my handwriting or looks like it could be my handwriting, but it is definitely a forgery. It is not my handwriting."

Other evidence disclosed by the record regarding the alleged crime will be recounted as it becomes material to the issues raised by this appeal.

The defendant contends that the court committed reversible error when a witness, Dolores Morran, was permitted to testify as a handwriting expert. As to the qualifications, this witness stated that she had worked at a local bank and from the year 1944 to 1959 she had been employed as a teller. During that fifteen year period she had the responsibility of making comparison of signatures in order to determine their genuineness. The signatures on checks would be compared with signatures which were on file at the bank. She stated she had to do this many times. She further stated that if there appeared to be any discrepancy the supervisor or someone in the bookkeeping department would also assist in making a determination. During this period of time she made thousands of comparisons. Since 1960 she served as an assistant

vice president of the bank and among her duties was required to approve checks and was authorized to solve some of the problems of the banking field, which included problems of forgery. It was her testimony that when there was any doubt as to the authenticity of a signature she might ask for a person's drivers license or other identification and compare the signatures appearing on such document with the signature that the bank had on file. Respecting forgeries she stated that on occasions a customer will claim that a check which cleared his account is a forgery and she would then compare the check with an affidavit. The foregoing is the substance of the testimony of the witness, Dolores Morran, as to her qualifications.

■■ It has been well established that the admissibility of expert testimony is to be determined by the trial judge and a wide latitude of discretion is given to the court in the determination of such admissibility unless it is clearly and prejudicially erroneous. *People v. Oberlander,* 109 Ill.App.2d 469, 248 N.E.2d 805; *People v. Harges,* 87 Ill.App.2d 376, 231 N.E.2d 650. In *First Galesburg National Bank & Trust Company v. Federal Reserve Bank,* 295 Ill.App. 524, 15 N.E.2d 337, the court stated:

"There is no test by which it can be determined with mathematical certainty how much experience or knowledge of handwriting a witness much (must) have in order to qualify as an expert for comparison. * * * In order that a witness be competent as an expert in respect to handwriting, it is not necessary that he should belong to any particular calling or profession; it is only necessary that the business opportunities and intelligence of the witness should be such as to enable him to have reasonable skill in judging of handwriting."

■■ Expert testimony is admissible when the subject matter of the inquiry is of such a character that only persons of skill and experience in it are capable of forming a correct judgment as to any facts connected therewith. It is elementary that where the court or jury can make their own deduction that shall not be made by those testifying. See *People v. Jennings,* 252 Ill. 534, 96 N.E. 1077.

■■ It is evident from the cases cited that the trial court not only has wide latitude in determining whether a witness qualified as an expert but in addition the court must determine if the testimony proferred as expertise is in fact of such nature.

In the instant case the witness who the State attempted to qualify as an expert saw the holdup note and a letter which the defendant had written to the State's Attorney for the first time on the morning of the day she appeared in court to testify. Her testimony as to the comparison made between the writings was scant, as was her testimony as to her

qualifications. While she may well be qualified to testify as an expert we do not feel that the record in this case supports a finding that she possesses the requisite expertise. Her testimony was confined to matters that are clearly observable and subject to determination by laymen, *i.e.*, the circles over the letter "i" instead of a dot, the slant of the letters, and the crossing of "t's." While these are matters that one would properly consider in comparing handwriting, they are not matters of such unusual and mysterious nature as to require the testimony of an expert witness. They were clearly observable by a jury which could have determined their importance if given the opportunity to do so.

■■■ In the instant case testimony regarding the handwriting appearing on the hold up note and the letter was extremely critical for the only other evidence to the effect that the defendant committed the crime of armed robbery was the testimony of the witness Tucker. The defendant categorically denied that he had committed the crime, therefore testimony regarding the comparison of the handwriting between the alleged "stick up" note and the letter which the defendant had written could and we must assume did in fact bear heavily upon the minds of the jurors. We can only conclude that in a case such as the one now before us where the testimony of a so-called handwriting expert is of such vital importance, great care should be exercised by the court in determining whether the witness has the requisite qualifications to be qualified as an expert. In the instant case we do not believe that such qualifications were present, nor do we consider the testimony given by the witness to be of that type or nature which is admissible into evidence as expert testimony.

The defendant raises a number of other issues which he contends constitute reversible error. In view of our holding that the trial court committed error in permitting a lay witness to testify as an expert, this case will be remanded for a new trial and consequently it is not necessary for us to consider all the issues presented for review by the defendant, since it is most unlikely that the situations which gave rise to the alleged errors now complained of will again occur. However, we believe that the defendant has raised two additional issues which require a determination by this court and consequently we direct our attention to them.

■■ The defendant contends that reversible error was committed when he was arrested without a warrant and upon hearsay evidence. The circumstances leading to this arrest are as follows. When the attendant Mark Hines returned to the service station his fellow employee, Dana Tucker, informed him that the station had been robbed. A few days later Hines went to the police station and requested an officer to

accompany him for the purpose of arresting the defendant, whom he had observed walking on the streets of Joliet. The police officer did accompany Hines, who identified the defendant, and the officer then promptly arrested him without a warrant. After searching the defendant he was placed in the police car and taken to the police station.

Chapter 38, Section 107, Illinois Revised Statutes, provides:

"A peace officer may arrest a person when:

(a) he has a warrant commanding that such person be arrested; or

(b) he has reasonable grounds to believe that a warrant for the person's arrest has been issued in the state or another jurisdiction; or

(c) he has reasonable grounds to believe that the person is committing or has committed an offense."

The record discloses that the arresting officer had also been the one who had investigated the alleged hold up on the date of June 16. He was aware of the charge that was made on the 16th and obviously was aware of the fact that Mark Hines could identify the suspect. We are of the opinion that the arresting officer had reasonable grounds to believe that the defendant had committed an offense and that the arrest was a proper one. Cases cited by the defendant are not in point nor applicable to the facts in this case.

Lastly we direct our attention to the defendant's contention that a "general verdict" instruction given by the court eliminated the possibility of his receiving a fair and impartial deliberation by the jury. The instruction complained of is taken directly from I.P.I. Criminal, 26.01, which is as follows:

"When you retire to the jury room you will first elect one of your members as your foreman or forelady. He or she will preside during your deliberations upon your verdict.

Your agreement upon a verdict must be unanimous. Your verdict must be in writing and signed by all of you, including your foreman or forelady.

Faithful performance by you of your duties as jurors is vital to the administration of justice.

You will be provided with two (2) forms of verdict. When you have unanimously agreed upon your verdict you will select the form which reflects your verdict and sign it as I have stated.

The forms of verdict which you will receive read as follows:

"We, the jury, find the defendant, Cleadus Stapelton, Not Guilty; and

We, the jury, find the defendant, Cleadus Stapelton, Guilty of Armed Robbery."

■■■ The defendant objects to this instruction on the theory that the

words contained therein "must be unanimous" and "when you have unanimously agreed" eliminate the possibility of a hung jury. We agree with the defendant that the mere fact that an instruction appears in I.P.I. does not cast it beyond the pale of a reviewing court's scrutiny; however, in the instant case the theory propounded about the standard "general verdict" instruction is too tenuous for us to accept. A reading of the instruction clearly indicates that the phrases complained of, namely, "must be unanimous" and "when you have unanimously agreed" are all predicated upon the assumption that the jury will reach a verdict. A "hung jury" cannot be said to be one that has reached a verdict and we fail to find any coercion implied or otherwise in the wording of the instruction that would compel a jury to find a defendant guilty or which precluded a jury from disagreeing, thereby resulting in a "hung jury."

For the reasons herein set forth this case is reversed and remanded for a new trial.

Reversed and remanded.

STOUDER, P. J., and DIXON, J., concur.